Rudolph LEE, Jr., Petitioner,

v.

Andrew J. WINSTON, et al., Respondents.

Civ. A. No. 82–0672–R.

United States District Court, E.D. Virginia, Richmond Division.

Oct. 15, 1982.

Supplemental Opinion Nov. 12, 1982.

Donald R. Curry, Stacy F. Garrett, III, Richmond, Va., for respondents.

Joseph R. Winston, John W. Moore, III, Richmond, Va., for petitioner.

## MEMORANDUM

MERHIGE, District Judge.

This matter came on for hearing on the instant Petition for Writ of Habeas Corpus and petitioner's application for a temporary restraining order, preliminary injunction, and permanent injunction on October 14, 1982. For the reasons set forth below, the application will be denied and the petition dismissed. This Memorandum embodies the Court's findings of fact and conclusions of law.

 Since petitioner is in custody in Richmond City Jail pending trial, the Court does not have jurisdiction pursuant to 28 U.S.C. § 2254, as petitioner asserts; that section provides jurisdiction only if the petitioner is in custody pursuant to a judgment of a state court. However, because the petitioner contends that he is in custody in violation of the Constitution, the Court does have jurisdiction over this claim pursuant to 28 U.S.C. § 2241(c)(3). The Court has jurisdiction over petitioner's claim under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1343(3).

### I. Factual Background

The facts as they appear from petitioner's pleadings and the transcript of the proceedings [1] in the Virginia trial court may be briefly summarized as follows:

Petitioner has been charged with malicious wounding, attempted robbery, and use of a firearm in the alleged commission of these two felonies.[2] On July 21, 1982, the Commonwealth's Attorney for the City of Richmond filed a Motion to Compel Evidence, seeking to recover a bullet lodged in petitioner's left chest. The Circuit Court conducted an evidentiary hearing on the motion beginning on July 22, 1982 and continuing on August 2, 11, and 25, 1982. At the conclusion of such hearing, the court entered its findings from the bench, concluding essentially that petitioner had been given a full opportunity to present his claim, the Commonwealth had demonstrated need for the bullet as evidence and could not obtain the same evidence from another source, and removal of the bullet would involve only a minor surgical procedure with virtually no threat of permanent injury to petitioner. (Tr. 109–111). Accordingly, the Circuit Court granted the Commonwealth's Motion to Compel Evidence, but stayed enforcement of the order to allow petitioner to undertake appropriate appellate review of the matter. Subsequently, on October 13, 1982, the Supreme Court of Virginia denied petitioner's Petition for Writ of Habeas Corpus and/or Writ of Pro-

---

1. In the early morning hours of July 18, 1982, Ralph E. Watkinson was locking the door of his business, the Lombardy Market, when he observed a man ("the assailant") approaching him with a gun in his hand. As the assailant approached Watkinson, the latter drew his own pistol. When the assailant yelled at Watkinson to "freeze," Watkinson fired two shots. The assailant returned the fire, striking Watkinson once in each leg. Thereafter, the assailant fled into a nearby alley. Watkinson was transported by ambulance to the Medical College of Virginia.

Shortly after the police arrived at the scene of the shooting, another police car responded to the area and the police officers in this latter car found the petitioner, Rudolph Lee, Jr., approximately eight blocks from the scene of the shooting with a gunshot wound in the left chest area. Petitioner was also transported by ambulance to the Medical College of Virginia.

2. Indictments in these matters were returned by a grand jury of the Circuit Court of the City of Richmond, Division I, on September 7, 1982 (Case Nos. F–82–1417 to 1420).

hibition. Thereafter, petitioner brought the instant Petition for Writ of Habeas Corpus.

## II. *Issues Presented*

Petitioner asserts that the Circuit Court's order sustaining the Motion to Compel Evidence deprives him of rights, privileges, and immunities secured by the fourth and 14th amendments to the U.S. Constitution. For his habeas corpus claim, petitioner alleges that the order will require additional custody in that he will have to be in custody and restrained by the respondent Sheriff or his agents for the bullet to be surgically removed in a hospital. For his § 1983 claim, petitioner alleges that the conduct complained of was and will be engaged in under color of state law.

As noted *supra,* the Court held a hearing on October 14, 1982 after notice to respondents. Respondents were present and took part in the hearing; the Court accepted into evidence the transcript and other documentary evidence of the proceedings in the Circuit Court and the Virginia Supreme Court. Accordingly, the petitioner need not satisfy the conditions of Rule 65(b), Fed.R. Civ.P. for an *ex parte* application for a temporary restraining order, *see Baines v. City of Danville,* 337 F.2d 579 (4th Cir.1964), affirmed on rehearing 357 F.2d 756 (4th Cir.) *aff'd mem.,* 384 U.S. 890, 86 S.Ct. 1915, 16 L.Ed.2d 996 (1966) (per curiam). When such a hearing is conducted, the procedure for considering an application for a temporary restraining order is essentially the same as that on an application for a preliminary injunction, and the distinction between the two forms disappears. *See Dilworth v. Riner,* 343 F.2d 226 (5th Cir.1965); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2951, at 449–500 & nn. 81–83 (1973). Were the Court to grant a preliminary injunction to petitioner, respondents might well be deprived of due process, given the brief notice they received. *See Bailey v. Transportation-Communication Employees Union,* 45 F.R.D. 444 (N.D. Miss.1968). However, even applying the less stringent standard for a preliminary injunction, the Court concludes that petitioner is not entitled to the relief sought.

The standard for a preliminary injunction in the Fourth Circuit is the balance-of-hardship test, whereby the district court's decision must be

based upon a flexible interplay of the four factors to be considered: (1) the likelihood of irreparable harm to the plaintiff without the temporary injunction; (2) the likelihood of harm to the defendant with the injunction; (3) plaintiff's likelihood of success on the merits; and (4) the public interest.

*Telvest, Inc. v. Bradshaw,* 618 F.2d 1029, 1032 (4th Cir.1980); *see Maryland Undercoating Co. v. Payne,* 603 F.2d 477 (4th Cir.1979); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir.1977).

"A future injury of uncertain date and incalculable magnitude is irreparable harm." *Phillips v. Crown Central Petroleum Corp.,* 602 F.2d 616, 630 (4th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980). In the instant case, petitioner faces a future injury of relatively certain date. The magnitude of the physical injury is also fairly certain—it is expected to be slight—as the Court's discussion *infra* reveals. The magnitude of the injury to petitioner's dignity from the proposed intrusion into his privacy is not, however, so certain. In sum, the Court concludes that petitioner faces a nominal risk of irreparable physical harm, *see infra,* and a not insubstantial risk of irreparable harm to his dignity.

The anticipated harm to the respondents is that they will be deprived of potential evidence at the time of trial on petitioner's criminal charges. The likelihood of such harm is conditioned on several factors now uncertain to varying degrees: whether the object in petitioner's shoulder is a bullet; if so, whether the bullet will be identifiable when removed; if so, whether the evidence will be useful at trial. It is also uncertain whether the delay occasioned by an injunction would cause an otherwise identifiable bullet to deteriorate to the point of being unidentifiable due to the corrosive effect of

body fluids. (Tr. 52–57). In sum, the Court finds the likelihood of harm to the respondents resulting from an injunction to be uncertain, but not negligible.

The Court will reserve discussion of petitioner's likelihood of success on the merits and consider the element of the public interest. At the risk of stating the axiomatic, the public interest is that justice be done—particularly in petitioner's criminal trial. Recovering and identifying the bullet could serve to exonerate the petitioner. If the bullet amounts to useful evidence for either side, it serves the public interest in justice, since the finder of fact presumably can better reach a just result if given more useful information. On the other hand, nearly 200 years of American jurisprudence under the Bill of Rights support the principle that protecting the rights guaranteed therein amounts to justice. In sum, the Court cannot conclude that the public interest in justice would be better served by either the granting or the denial of the injunction.

Similarly, consideration of the likelihood of irreparable harm to the petitioner without the injunction and the likelihood of harm to the respondents with the injunction does not yield a clear indication of the balance of the hardships. Accordingly, the "flexible interplay" of the factors depends heavily on plaintiff's likelihood of success on the merits.

### III. *Stone v. Powell*

■ Before reaching the merits of petitioner's claim that the proposed surgery will violate his fourth amendment rights, the Court must address respondents' contention that *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), precludes the Court from reaching the merits. That case, of course, limits the substantive scope of federal habeas corpus review, holding that when a state prisoner asserts that the state trial court failed to exclude evidence that the prisoner alleges came from an unconstitutional search or seizure, the federal court is only to inquire into whether the state had provided the prisoner an opportunity for a full and fair litigation of his or her claim. *Id.* at 481–82, 96 S.Ct. at 3046.

Both the holding and the rationale of *Stone v. Powell* are very closely tied to the practice and principles surrounding the exclusionary rule. On both occasions when the Court explicitly framed the question presented, it did so in terms of the introduction or exclusion of allegedly tainted evidence at trial. *See id.* at 469, 489, 96 S.Ct. at 3040, 3050. The holding was expressed in the same terms. *See id.* at 481, 96 S.Ct. at 3046 ("[W]e conclude, in light of the nature and purpose of the Fourth Amendment exclusionary rule . . ."); *id.* at 481–82, 494–95, 96 S.Ct. at 3046, 3052.

In Part III of the opinion, *id.* at 482–89, 96 S.Ct. at 3046–50, the Court traced the history and rationale of the exclusionary rule. "The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights." *Id.* at 486, 96 S.Ct. at 3048. The Court concluded that this purpose would not be substantially furthered by federal habeas corpus review of state court convictions, since the connection between the police misconduct and the eventual result would be so attenuated. *Id.* at 493, 96 S.Ct. at 3051.

By contrast, the instant petition affords the Court the opportunity to offer guidance to law enforcement officials before they undertake the proposed search. Rather than deciding ex post whether evidence should have been excluded as illegally obtained, the Court can decide ex ante whether obtaining the evidence would be illegal. To borrow the terminology of punishment theory, the exclusionary rule promises at best general deterrence: the theory is that law enforcement officials will be deterred from making illegal searches in other cases because of the result that followed in a particular case. By contrast, in the instant case, the Court can, if necessary, provide special deterrence, as well as general deterrence: it can deter the very search in question, as well as guide future searches. Accordingly, the Court will proceed to the merits of petitioner's fourth amendment claim; respondents' assertion is rejected.

## IV. Fourth Amendment Analysis—Proper Standard

The petitioner rests his claim of deprivation of fourth amendment rights on *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In that case, the Supreme Court approved the taking of blood from the defendant without his consent so that his blood alcohol content could be determined. However, the Court stressed that they "reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we hold today that the Constitution does not forbid the State *minor intrusions* into an individual's body under *stringently limited conditions* in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.* at 772, 86 S.Ct. at 1836 (emphasis added). Thus, this Court must determine whether the proposed intrusion would be minor and the proper limiting conditions met.

The Court notes at the outset that the instant case presents a most troubling fact situation. The proposed intrusion takes the form of an incision of about 1.5 centimeters in length to remove an object approximately 0.5 centimeters beneath the skin. (Tr. 64–65). In sheer physical terms, this procedure obviously involves a greater intrusion than that required for the taking of a blood sample in *Schmerber.* As explained *infra,* the Court concludes that the particular facts before the Court do not constitute an impermissibly great intrusion under the terms of *Schmerber.* However, the Court stresses that the instant situation appears to represent essentially the limit in the degree and kind of intrusion constitutionally permissible.

Before proceeding to the *Schmerber* analysis, the Court notes that in *United States v. Crowder,* 543 F.2d 312 (D.C.Cir.1976) (en banc), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977), apparently the only federal case applying *Schmerber* analysis to a surgical procedure, the court approved a removal of a bullet under conditions very similar to those in the instant case. Petitioner contends that the *Crowder* court did not correctly apply *Schmerber;*[3] he derives from *Schmerber* a four-part test to determine whether an intrusion is unreasonable. The test petitioner proposes represents essentially the most generous (to petitioner) possible reasonable reading of what *Schmerber* requires. In the interest of giving full consideration to petitioner's claim, the Court will assume, without deciding, that petitioner correctly characterizes the significance of *Schmerber* and that *Crowder* is not controlling.

## V. Fourth Amendment Analysis—Applying Schmerber

As petitioner reads *Schmerber,* 384 U.S. at 770–72, 86 S.Ct. at 1835–36, a court that is deciding whether an intrusion is unreasonable is to examine whether: (1) there was a need for the evidence; (2) there was a clear indication the evidence would be found; (3) the procedure was a minor one with "virtually no risk, trauma, or pain;" and (4) the procedure was reasonably carried out in a hospital environment by medical personnel.

To apply the test, the Court must examine the facts on the record. The medical testimony in the Circuit Court indicated that the proposed surgery would be performed under local anesthetic. The doctor who testified characterized the procedure as "minor surgery." As noted *supra,* the incision would be 1.5 cm in length and deep enough to remove an object 0.5 cm beneath the surface of the skin. The object is now far from the nerves and arteries, so the chances of harming such structures by the surgery are "almost zero," according to the

---

**3.** Petitioner finds the *Crowder* application faulty because: the *Crowder* court looked for only probable cause for the search, whereas *Schmerber* required "a clear indication that in fact such evidence exists," 384 U.S. at 770, 86 S.Ct. at 1835; the *Crowder* court failed to consider the need for the evidence, as *Schmerber* did, *id.* at 770–71, 86 S.Ct. at 1835–36; and to determine whether the operation was minor, the *Crowder* court looked at the risk of permanent injury, whereas the *Schmerber* court looked to see that there was "virtually no risk, trauma, or pain," *id.* at 771, 86 S.Ct. at 1836.

doctor. He testified that the chance of harming the patient by the procedure was perhaps one in 10,000 or one in 100,000; however, the danger in leaving the bullet, "if it doesn't produce any pain or other problem," is probably zero. Thus, the doctor concluded that it was more dangerous to the patient to remove the bullet than to leave it. (Tr. 15–25, 63–71).

Petitioner challenges the first element of the test on the ground that the Commonwealth claims to have an eyewitness (the victim) who will positively identify the petitioner. Thus, petitioner contends that the specific evidence is not needed. Respondents assert that the evidence is necessary to rebut petitioner's claim that the bullet came from a different gun. The Court concludes that the respondents have established a need for the specific evidence. Petitioner does not suggest that there must be a *compelling* need, and the Court cannot say that there is not any need for it, that it would be merely cumulative.

Petitioner also challenges the "need" element more generally, asserting that the proposed procedure is much more rare than the blood sampling approved as a routine procedure in *Schmerber,* and that blood alcohol determinations are more necessary to prosecuting drunk driving violations than ballistics determinations are to other types of prosecutions. There is no evidence before the Court to support such assertions. The Circuit Court specifically found the "need" element satisfied, both specifically and generally. (Tr. 112–13). It seems at least equally plausible as not that when the procedure is as relatively simple as the one proposed, the routine practice is to undergo the surgery, even if that is slightly more risky than leaving an object embedded under the skin. Similarly, there is no apparent reason to doubt the general usefulness of ballistics information, whether or not the bullet involved was ever lodged in a human body.

As to the second element, there is apparently no doubt that a foreign object is lodged in petitioner's shoulder, and there is substantial evidence that the object is probably a bullet. The only real question is whether the bullet will amount to evidence. Given the possibility that the bullet will be unidentifiable, it is not *certain* that evidence will be found. But the Court is satisfied that there is a "clear indication" that evidence will be found, beyond a "mere chance," *Schmerber,* 384 U.S. at 770, 86 S.Ct. at 1835. As the Circuit Court noted (Tr. 112), petitioner apparently does not seriously challenge either this factor or the fourth, that the procedure would be performed in a hospital.

The element petitioner challenges most strongly, and the one of greatest concern to the Court, is the third: whether the procedure involves "virtually no risk, trauma, or pain," *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836. The Circuit Court also explicitly found this element satisfied (Tr. 110, 112), and this Court concludes likewise. As noted *supra,* the doctor did testify that the risk was greater than the risk involved in leaving the bullet, though he also qualified his assessment of the latter risk by saying "if [the bullet] doesn't produce any pain or other problem." But he estimated the risk of the procedure as perhaps one in 10,000 or one in 100,000. "Virtually no risk" does not mean "absolutely no risk." While the Court declines to attempt to establish any specific guidelines as to what quantity of risk constitutes "virtually" none, it does find that the uncontroverted evidence in the instant case establishes that the proposed procedure can be carried out with virtually no risk to the petitioner.

The Court concludes that the precise facts before it do not establish an unreasonable intrusion into petitioner's privacy under the terms of *Schmerber.* Accordingly, the Court concludes that petitioner is not likely to prevail on the merits of his claim that his fourth amendment rights would be violated by the proposed surgery. This conclusion applies to both the habeas corpus claim and the § 1983 claim.[4]

4. Accordingly, the Court need not consider respondents' contention that *Allen v. McCurry,*

449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308

## VI. *Setting of Bond*

At the hearing of August 2, 1982, the Commonwealth's Attorney moved to increase petitioner's bond from $10,000 to $50,000. The Circuit Court raised the bond to $30,000 and declined to reverse itself at the hearing of August 25, 1982. Petitioner asserts that in raising the bond, the Circuit Court considered only the possibility that petitioner would destroy the evidence, which petitioner says is not a permissible basis for setting bond under Va.Code § 19.-2–121.

The Petition and accompanying Memorandum do not make clear whether petitioner raises this claim as a means for establishing his custody for purposes of his habeas corpus claim or as a separate deprivation of constitutional rights. If his purpose is the former, the Court need not consider the contention, as the Court has accepted for purposes of the habeas corpus claim petitioner's assertion that he would be in the custody of the Sheriff or his agents at the time of the surgery.

If petitioner's purpose is the latter, his claim is unsupported by the record. At the August 25 hearing, the Circuit Court clearly indicated that it was taking into account the factors related to insuring the presence of the accused, as Va.Code § 19.2–121 directs. The Circuit Court also gave petitioner full opportunity to put on evidence as to such factors. (Tr. 104–06, 113–22). Whether or not the Circuit Court erred in raising the bond on August 2, it has now given full consideration to the appropriate factors for setting bond. Petitioner has not demonstrated that his current confinement violates the Constitution.

## VII. *Conclusion*

The Court concludes that petitioner has not justified the imposition of a preliminary injunction in light of the four factors enunciated in *Telvest, Inc. v. Bradshaw, supra.* In the instant case, the critical factor is the likelihood of prevailing on the merits. The Court is satisfied that the likelihood that petitioner will so prevail is too slight to cause the interaction of the four factors to be resolved in his favor.

An appropriate order will enter.

## SUPPLEMENTAL OPINION

By order of October 15, 1982, the Court dismissed petitioner's [1] petition for a writ of habeas corpus and denied his application for an injunction that would have prohibited the respondents from causing the surgical removal of an object, believed to be a bullet, from petitioner's chest. The factual background of this matter is set out in the Court's memorandum of October 15.

On October 21, 1982, the petitioner received a hearing in the Circuit Court of the City of Richmond, Virginia, Division I ("state court") on his claim that circumstances had changed such that the state court should rescind its order allowing the surgical procedure. The state court denied petitioner's motion to revoke or rescind the order.

Petitioner immediately sought review in the Supreme Court of Virginia and, on the same day, filed a "Motion for a New Trial" in this Court. The matter in this Court came on for hearing before the Honorable D. Dortch Warriner on October 21 and 22, 1982. Upon the advice of counsel that a transcript of the state court proceedings was not then available, and upon the assurances of counsel for respondents that the surgical procedure would not be implemented pending the production of such tran-

---

(1980), bars this Court's consideration of the merits of petitioner's § 1983 claim.

**1.** Much of what appears in the transcript may be based on hearsay testimony; however, the operative facts bearing on the question before this Court do not appear to be based on hearsay. Accordingly, the Court has no occasion to consider the possibly hearsay nature of certain background facts as set forth in this footnote.

To the extent that this action arises under 42 U.S.C. § 1983, as well as being a petition for a writ of habeas corpus, petitioner might better be styled "plaintiff." However, in the interests of simplicity and consistency, the Court will refer to him as "petitioner," even in regard to matters relevant only to his § 1983 claim.

script, the Court declined to issue the requested restraining order, concluding that the agreement of the parties obviated the need therefor.

During the time in which the transcript was being prepared, the petitioner filed a motion to redesignate his "Motion for a New Trial" as a "Motion to Reopen the Petition and to Alter or Amend the Judgment." The Court subsequently ordered the petition reinstated on the docket. As stated in the Court's memorandum of Octo-

ber 15, the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1343(3), 2241(c)(3).

■ After the parties submitted a copy of the state court transcript, the matter again came on for hearing in this Court on November 1. By that time, the Supreme Court of Virginia had denied petitioner's motion for reconsideration. At the November 1 hearing, this Court found that the state court transcript from the October 21 hearing was devoid of factual findings.[2]

**2.** In a habeas corpus proceeding under 28 U.S.C. § 2254(d), factual determinations by a state court are "presumed to be correct," and this Court could not disregard such determinations without explaining its basis for overcoming the presumption of correctness. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). However, the Court has found that the state court made no such factual determinations. The only finding of the court that appears in the record is stated as follows: "that there is no material change in circumstances that would require this Court to change Judge Lumpkin's previous order" (Tr. 86); "that there are no particular changes in circumstances" (Tr. 87); "that there has been no material changes to warrant revoking or rescinding this Court's Order of August 25, 1982.-" These conclusions were additionally memorialized in the state court's order of October 21, 1982 (Respondents Ex.1). The Court has found that these statements constitute a conclusion of law rather than a finding of fact.

Even if that conclusion is taken to be a factual determination for purposes of § 2254(d), the Court concludes that "such factual determination is not fairly supported by the record," 28 U.S.C. § 2254(d)(8), so that the presumption of correctness is overcome. As appears from the Court's discussion *infra,* the Court concludes that the circumstances now before the Court justify imposition of the injunction requested, whereas the Court concluded on the circumstances previously presented, *i.e.,* the circumstances on which Judge Lumpkin based the August 25 order to perform the surgical procedure, that the injunction should not issue. *A fortiori,* the Court considers the difference in circumstances material.

Under § 2254(d)(2), the presumption of correctness is overcome also if "the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing." Upon examination of the state court transcript and the affidavit of petitioner's counsel, filed October 21, 1982, the Court concludes that the procedures followed in the state court were conducted with such haste that the petitioner did not have a full and fair opportunity to litigate his claim there. At the October 21

hearing, petitioner's counsel protested that he had had only two days in which to prepare for the hearing, and in that short time he had been unable to interview all the witnesses, review all the medical records, research the medical and legal issues involved, and obtain the services of an expert anesthesiologist who could help prepare cross-examination of the hospital's anesthesiologist and could testify on petitioner's behalf. When the court took a midday recess, the court asked petitioner's counsel if he had any further evidence to put on. Petitioner's counsel represented that he would like to call an independent anesthesiologist who had had a chance to review the records and perform a "consult," but he could not have one available at two o'clock, when the court intended to continue. (Tr. 68–69). The court responded: "Well, we will hear him at two o'clock if you have him; otherwise we'll hear your argument." (Tr. 70). After the recess, petitioner's counsel made a proffer concerning an anesthesiologist he had contacted, but who was in surgery at two o'clock; he also noted his unsuccessful efforts to reach another anesthesiologist. (Tr. 70–71).

The record does not indicate any exigent circumstances leading the state court to curtail its inquiry; the Court must assume that the normal press of judicial business urged the state court to move the matter along expeditiously. While the Court appreciates and shares the concern that judicial proceedings must not be needlessly prolonged, the Court concludes that in this instance petitioner did not have a fair opportunity to prepare for the October 21 hearing. The Court has been impressed with the diligence, not to mention the legal skill, exhibited by petitioner's counsel, and the Court is satisfied that he did all that he could do or that a court could expect him to do during the two days he had in which to prepare for the October 21 hearing. He simply did not have adequate time to do his own preparation work, and it is not surprising that on such short notice he could not locate an expert anesthesiologist for whom the hearing date was available. Thus, "the factfinding procedure ... was not adequate to afford a full and fair hearing" for purposes of 28 U.S.C. § 2254(d).

The Court then entered a temporary restraining order against the surgical procedure in order to afford the parties an opportunity to submit such additional evidence as either side deemed appropriate. On November 10, evidence, encompassing medical records, x-ray prints, and testimony of a surgeon, was taken. At that hearing, all parties agreed that the matter was submitted on the merits for purposes of considering the application for a permanent injunction. This memorandum embodies the Court's findings of fact and conclusions of law supplemental to or, where appropriate, in lieu of those set forth in its October 15 memorandum.

### I. *Motion to Dismiss Parties*

Respondents the Attorney General of Virginia, Gerald L. Baliles, and the Circuit Court of the City of Richmond, Virginia, Division I, have moved the Court for an order dismissing them as parties to this action. In support of their motion, these respondents state, "This Court has ruled that the above-styled case is being considered solely as a petition for a writ of habeas corpus"; therefore, inasmuch as these respondents are not "custodians" of petitioner against whom the writ will issue, they contend they are not proper respondents to a petition for a writ of habeas corpus. The fundamental deficiency in respondents' argument in this regard is the fact that petitioner's alleged cause of action under 42 U.S.C. § 1983 remains pending before this Court, and respondents are proper parties defendant to that claim. Judge Warriner, in noting the petitioner might be barred by res judicata in his § 1983 action from relitigating certain issues, did not dismiss the § 1983 claim; rather, Judge War-

riner indicated he was viewing the matter which came on for hearing before him as a petition for a writ of habeas corpus. Judge Warriner stated he was pursuing this approach because the equitable powers of the Court upon a writ of habeas corpus were sufficiently broad to afford petitioner the immediate relief requested, if justified. There was, consequently, no cause to consider the possible res judicata effects of the state court findings at the time the issue was raised.[3] Accordingly, respondents' motion will be denied.

### II. *Abstention*

Respondents urge this Court to abstain "from intervening in a pending state criminal prosecution." In support of this suggestion, respondents rely on the decision of the United States Supreme Court in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and contend the instant matter does not fall within an exception to the *Younger* doctrine.

■ As an initial matter, the Court notes the anti-injunction statute, 28 U.S.C. § 2283, expressly provides, in part, "[a] court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by Act of Congress." In *Younger,* the Supreme Court reserved the question whether actions brought under 42 U.S.C. § 1983 fall within the "expressly authorized" exception to the anti-injunction statute. 401 U.S. at 54, 91 S.Ct. at 755. In the subsequent Term of the Court, however, the Court squarely addressed the issue and concluded § 1983 presents an express exception to the proscription of § 2283. *See Mitchum v. Foster,* 407 U.S. 225, 242–43, 92 S.Ct. 2151, 2162, 32

---

This conclusion also undermines respondents' contention that *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), prohibits the Court from reaching the merits of this matter. As the Court's October 15 memorandum explained, neither the holding nor the rationale of *Stone v. Powell* applies to the instant matter because this matter does not involve the exclusion or admission of evidence allegedly resulting from an unconstitutional search or seizure. But additionally, *Stone v. Powell* only precludes federal habeas corpus

consideration of the merits "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim." *Id.* at 494, 96 S.Ct. at 3046. Petitioner received no such opportunity in the state court.

**3.** It is apparent the Court could not have concluded the § 1983 action was barred by res judicata since the state court findings were not before the Court for consideration at the time of the hearing.

L.Ed.2d 705 (1972). Accordingly, the anti-injunction statute does not operate in this § 1983 action to bar this Court from restraining the respondents' alleged prospective violation of petitioner's constitutional rights in the state court criminal proceeding. Similarly, it has long been established that a federal court may stay a state court criminal proceeding for any matter involved in a federal habeas corpus proceeding, *see, e.g., Ex parte Royall,* 117 U.S. 241, 248–49, 6 S.Ct. 734, 738, 29 L.Ed. 868 (1886); 28 U.S.C. § 2251; therefore, § 2283 provides no impediment to this Court's authority to grant the relief requested even insofar as this matter proceeds as a petition for a writ of habeas corpus under 28 U.S.C. § 2241.

The anti-injunction statute being inapplicable to bar consideration of the instant matter, the question becomes whether the principles articulated in *Younger* counsel against this Court's passing on the issues raised.[4] *Younger* dealt with the decision of a three-judge court to restrain a state prosecution under what the three-judge court found to be an impermissibly vague and overbroad state statute. In the cause *sub judice,* petitioner has not requested that this Court restrain his prosecution in the state court. Nor would the relief sought, if granted, prevent the state from going forward with that criminal proceeding. The precise question addressed in *Younger* is, therefore, not presented on the facts of this case. To the extent *Younger* may be read as speaking to the broader issue of federal court intervention of any kind in pending state court criminal proceedings, however, and the *Younger* opinion may fairly be so read,[5] the Court has examined the *Younger* rationale in determining whether abstention is required in this case.

*Younger* represents a reaffirmation of the national policy forbidding federal courts

to stay or enjoin pending state court proceedings except under special circumstances. 401 U.S. at 41, 91 S.Ct. at 749. The "special circumstances" alluded to must take the form of threatened great and immediate irreparable injury. *Id.* at 46, 91 S.Ct. at 751. The Court pointed out, however, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution cannot, by themselves, form the basis for this type of great and immediate irreparable injury. "Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.*

Having reviewed the limited factual record before the Court, it is apparent the special circumstances which render *Younger* abstention inappropriate are present in the case at bar. As the threatened harm involves involuntary surgery on petitioner's person, it may easily be seen the prospective harm is "great." Similarly, the Commonwealth having unswervingly indicated its intention to proceed with such surgery, the immediacy of the threatened injury is apparent. The state court considered the matter and entered an order empowering the Commonwealth to remove the bullet from plaintiff involuntarily. At the November 1 hearing in this Court, the Commonwealth felt it could not agree to refrain from implementing the surgical procedure in the period before this Court's evidentiary hearing, thus necessitating the Court's temporary restraining order. It is thus beyond dispute the threatened harm is impending and immediate.

Equally clear is that the threat to petitioner's fourth amendment right to be secure in his person from an unreasonable search and seizure can in no way be elimi-

---

4. In *Mitchum v. Foster, supra,* the Court noted:
 [W]e do not question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding. These principles, in the context of state criminal prosecutions, were canvassed at length last Term in *Younger v. Harris,* 401 U.S. 37

[91 S.Ct. 746, 27 L.Ed.2d 669], and its companion cases. They are principles that have been emphasized by this Court many times in the past.
 407 U.S. at 243, 92 S.Ct. at 2162 (citations omitted).

5. *See Younger,* 401 U.S. at 43, 46, 91 S.Ct. at 750, 751.

nated by his defense of the charges in the state court action. Indeed, it is apparent the threatened harm will ripen into actual injury should this Court fail to intervene. The factual distinctions between the *Younger* case and the instant matter perhaps best illustrate why petitioner's defense of the criminal charges will be unavailing to eliminate the threatened harm.

In *Younger,* after state criminal proceedings had been commenced against them, the appellees had been granted declaratory and injunctive relief by a three-judge federal court which declared a state statute facially void for vagueness and overbreadth and restrained the State of California from prosecuting the appellees thereunder. The Supreme Court reversed, finding the threatened injury to appellee Harris to be only " 'that incidental to every criminal proceeding brought lawfully and in good faith,' " and the same to be insufficient to justify federal intrusion into a pending state court criminal proceeding. 401 U.S. at 49, 91 S.Ct. at 753 (quoting *Douglas v. City of Jeannette,* 319 U.S. 157, 164, 63 S.Ct. 877, 881, 87 L.Ed. 1324 (1943)). Underlying the Court's conclusion in this regard was the availability of the state forum for the raising of Harris's constitutional claims. Notions of comity, that is, a proper respect for state functions, were said by the Court to fare best if the states and their institutions were left free to perform their separate functions in their separate ways. 401 U.S. at 44, 91 S.Ct. at 750. In *Younger,* appellee Harris was free to raise the facial invalidity of the statute in question as a defense to the state criminal charges. If unsuccessful in the trial court, Harris could raise the issue on direct appeal in the state system and possibly in the United States Supreme Court. If denied relief on direct appeal, Harris had the option of asserting his constitutional claims in a collateral attack on his conviction. Thus, the threatened harm, namely, conviction under an assertedly unconstitutional statute, could be eliminated by Harris's defense of the criminal charges in the state courts, and thus the special circumstances warranting or justifying federal intervention were not present.

In contrast to the *Younger* case, the instant petitioner's defense of the state criminal charges cannot eliminate the threat of the asserted violation of his fourth amendment rights. As the Commonwealth has indicated its intention to proceed with the surgery, and the courts of Virginia have placed their imprimatur on the procedure, this Court's failure to act will undeniably result in the involuntary removal of the bullet from petitioner's body. Accordingly, the prospective constitutional abridgment complained of here will take place and be complete and irreversible prior to the criminal trial. Moreover, unlike the situation in *Younger,* petitioner here will have no opportunity to vindicate the claimed abridgment by way of his defense of the criminal charges at trial. Petitioner is not here attempting to suppress evidence illegally obtained; rather, he seeks an injunction preventing an allegedly impermissible physical intrusion by the Commonwealth into his body. Were the bullet removed from his body but later suppressed as evidence by the trial court,[6] it nevertheless could not be said that the harm to petitioner had been eliminated by his defense to a single criminal prosecution, as required by *Younger,* for the threatened harm will have ripened into actuality at the moment petitioner is involuntarily subjected to the surgical procedure.

In summary then, because the threatened harm to petitioner is irreparable, great, and immediate, and cannot be eliminated by his defense against the criminal charges in the state court, the Court concludes abstention under the *Younger* doctrine is neither required nor appropriate.

### III. *Dismissal of Claim*

Insofar as this matter proceeds as a petition for a writ of habeas corpus, defendants contend this Court lacks subject matter jurisdiction because plaintiff is not cur-

---

**6.** It would appear doubtful the state court would entertain a motion to suppress based on an impermissible search in view of the possible res judicata/collateral estoppel effects of its prior determinations.

rently "in custody" as that term is used in 28 U.S.C. § 2241. Although the Court acknowledges the instant matter presents a somewhat novel view of the custody requirement, the Court concludes the broad interpretation given that term by the United States Supreme Court warrants the conclusion that this petitioner is "in custody." *See Hensley v. Municipal Court, San Jose-Milpitas Judicial District,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). In *Hensley,* the Court concluded a petitioner who was free on his own recognizance pending execution of sentence was nonetheless "in custody" within the meaning of 28 U.S.C. § 2254(a).[7] Of particular importance to the case at bar, the Court stated:

> Plainly, we would badly serve the purposes and the history of the writ to hold that under these circumstances the petitioner's failure to spend even 10 minutes in jail is enough to deprive the District Court of power to hear his constitutional claim.

411 U.S. at 352–53, 93 S.Ct. at 1575. Similarly, it would be absurd for this Court to require petitioner to be strapped momentarily to the surgeon's table before considering his petition. To the extent the "custody" in question may be viewed as future custody, the matter is addressed by Rule 2(b) of the Rules Governing § 2254 Cases and the notes accompanying it. Specifically, the Advisory Committee stated in part in a note accompanying Rule 2:

(5) The applicant is in custody, although not physically restrained, and is attacking a state action which will result in his future custody rather than the government action out of which his present custody arises.

It cannot be disputed that the custody complained of here will be carried out under the auspices of the Commonwealth. In other words, it is clearly the action of the state which will subject petitioner to custody in the operating room. Accordingly, whether the restraint on petitioner is viewed as present custody under *Hensley* or future custody of the type referred to in Rule 2(b), the Court concludes petitioner is "in custody" for purposes of 28 U.S.C. § 2241. Further, petitioner having exhausted all state remedies available to him, the Court concludes it has subject matter jurisdiction over the instant petition.

While the Court is satisfied that its conclusion as to the custody question is correct, the Court recognizes that the question is a close one.[8] However, the Court is also satisfied that the instant action can proceed in precisely the same manner in its form as a civil rights action pursuant to 42 U.S.C. § 1983. The only impediment respondents have suggested to treating this matter as a § 1983 action is the principle of collateral estoppel set forth in *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

Even supposing the state court made adequate findings and conclusions for purposes of collateral estoppel, *Allen v. McCurry* does

---

7. The Court is aware of no distinction between the meaning of "in custody" under § 2254(a) on the one hand and § 2241 on the other.

8. Although the language of Rule 2(b) and the accompanying Advisory Committee note clearly contemplates petitions attacking future custody generally, it might be argued the Committee had in mind the context where a current prisoner who faces future additional confinement on a different conviction seeks to collaterally attack that conviction. If the Committee would limit the procedure to that context, then the Committee's remarks do not support the Court's conclusion that the instant petitioner satisfies the "in custody" requirement. Of course, the Committee may have had that context in mind, if indeed it did, only because that context is the most common one in which the

issue of attacking future custody arises, and not out of an intent to limit the procedure to that context.

Resort to the approach of the Supreme Court in *Hensley* provides a sounder basis for examining the custody question. It cannot seriously be contended that a meaningful distinction exists between the custody in which petitioner now finds himself and the unique custody to which he will be subjected in the operating room. The surgical procedure will be conducted at the behest and under the authority of the Commonwealth, and will, therefore, be but part and parcel of the Commonwealth's current custody of petitioner. This being so, the Court comprehends no purpose to be served by constructing a metaphysical distinction between these "custodies" where, in reality, none exists.

not indicate that this Court should give collateral estoppel effect to the state court determinations here. "[O]ne general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." *Id.* at 95, 101 S.Ct. at 415. The Court has already determined that petitioner did not receive a full and fair opportunity to litigate this matter in the state court, *see* note 2 *supra;* accordingly, no collateral estoppel effect attaches to such determinations as the state court made.

Thus, the Court concludes that respondents have not raised grounds justifying dismissal of this matter either as a habeas corpus action or as a § 1983 claim.

### IV. *Change of Circumstance*

■ The evidence before the Court[9] indicates petitioner's physical condition probably has not changed since October 15, 1982, *i.e.,* the bullet apparently has not moved. The changed circumstance petitioner relies on is that more is now known about his physical condition than before, *i.e.,* the bullet is now known to be in a different location from that previously supposed. In preparation for surgery, the hospital staff took some 10 or 12 x-rays of petitioner's chest. The uncontroverted evidence is that those x-rays indicate the bullet is lodged at least 2.5 to 3 centimeters below the surface of the skin. The previous estimate that the bullet was located about 0.5 centimeters below the skin was based only on clinical examination in the form of palpating, or manually manipulating, a hard mass assumed to be the bullet; the surgeon who testified at the state court hearing on October 21 indicated he now believes that hard mass to be scar tissue.

The uncontroverted evidence shows, and the Court finds, that the bullet is apparently lodged in muscle tissue; excising it would require an incision of approximately 5 centimeters; the surgeon designated to perform the procedure would require that petitioner be placed under general anesthesia for the operation; an anesthesiologist would administer a sedative to relax the patient, then sodium pentothal, a barbiturate, to put the patient to sleep, then a gaseous mixture of oxygen and nitrous oxide; and the risks involved in the procedure are greater than those associated with the procedure previously contemplated.

The Court concludes that this set of circumstances is materially different from the former one where: (1) the bullet was thought to be lodged just beneath the skin; (2) excising it would have required an incision of approximately 1.5 centimeters; and (3) the procedure would have been performed under local anesthesia. The sources of increased risk attending the procedure currently contemplated are many: penetrating the muscle layer and separating the muscle fibers increases the danger of damaging nerves, blood vessels, and other tissues such as that surrounding the pleural cavity; the longer and deeper incision carries with it an increased danger of infection; administering general anesthesia requires preliminary testing that carries risks of its own, and general anesthesia itself carries enough risks, such as of depressed respiration, that the anesthesiologist attends the surgery and constantly monitors vital signs, whereas local anesthetic can be administered entirely by the surgeon. The Court must examine the legal significance of the circumstances now before it.

### V. *Fourth Amendment Claim*

In the October 15 memorandum, the Court applied a test the petitioner had derived from *Schmerber v. California,* 384

---

**9.** The findings of fact embodied in this section are derived entirely from the transcript of the state court proceedings of October 21. The Court finds the additional evidence submitted by the parties to be either cumulative or, in the case of the x-ray prints, incomprehensible. Thus, the Court's conclusion that the facts are materially different from those previously presented is based entirely on the state court record; in determining that the state court conclusion that there were no materially different circumstances was "not fairly supported by the record," *see* note 2 *supra,* the Court is looking at the same body of evidence.

U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), to decide whether, even under the interpretation most generous to the petitioner, the proposed intrusion was unreasonable in terms of the fourth amendment. This Court's reading of *Schmerber,* however, is that the four factors petitioner identified in the opinion were not set forth as a test. Rather, the *Schmerber* Court was merely identifying elements of the situation before it that supported the conclusion that the intrusion in that case was constitutionally permissible.

Fourth amendment questions are peculiarly fact-specific, so it is not surprising to find that a court's decision rests on the particular facts before it. Yet the lower courts must carefully examine the Supreme Court's decisions and derive all available guidance from them. Sometimes the lower courts derive tests and doctrines from the Supreme Court's observations as to the facts of a specific case. To date, however, apparently no federal court has extrapolated such a test from *Schmerber.* Indeed, the only federal case applying *Schmerber* to a surgical procedure, *United States v. Crowder,* 543 F.2d 312 (D.C.Cir.1976) (en banc), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977), mentioned none of petitioner's asserted four factors, though it did examine some elements related to them, and this Court declines to enunciate a "*Schmerber* doctrine" based on the Supreme Court's analysis of particular facts.

The Court will, however, apply the explicit holding of *Schmerber:*

That we hold today that the Constitution does not forbid the State minor intrusions into an individual's body under stringently limited circumstances in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

384 U.S. at 772, 86 S.Ct. at 1836. And while the Court does not find a litmus test in the Supreme Court's observations as to the facts before it, the Court does find some guidance as to the *kinds* of factors considered relevant to a determination of whether an intrusion is "minor" and performed "under stringently limited circumstances."

In the October 15 memorandum, this Court characterized the set of facts then before it as representing "essentially the limit in the degree and kind of intrusion constitutionally permissible." The current set of facts exceeds that limit. Without repeating in detail the nature of the proposed procedure and the associated risks,[10] the Court simply observes that the totality of the factors involved constitutes a physical intrusion that is significantly greater than that previously contemplated, and the risks previously involved have increased in magnitude even as new risks are being added. While the evidence did not adequately quantify at least some of those risks, the Court is satisfied that, taken together, they far exceed the level of "virtually no risk." *Id.* at 771, 86 S.Ct. at 1836. The Court concludes that an incision 5 cm long and 2.5 cm deep under general anesthesia to permit probing into and past muscle tissue simply cannot be characterized as a minor intrusion. Whether or not a surgeon would characterize the procedure as "minor surgery" is of no moment; there is no reason to suppose that the definition of a medical term of art should coincide with the parameters of a constitutional standard.

*Schmerber* essentially addresses only the extent and nature of physical intrusion, since that was basically all that was involved in the blood test there. However, the reasonableness of an intrusion turns also on the degree and manner of its interference with a person's privacy and dignity. In *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Court made no reference to physical pain or risk in evaluating the constitutionality of the intrusion involved in pumping the petitioner's stomach to obtain the evidence lodged there. The Court simply said, "This is conduct that shocks the conscience." *Id.* at 172, 72 S.Ct. at 209.

**10.** *See* Part IV, *supra,* at 9–10.

The Court does not here identify any single element of the proposed procedure as the linchpin to the Court's determination of the reasonableness of the intrusion, but the fact that general anesthetic is involved is very important to the Court's conclusion that the procedures shock the conscience. The Court is appalled at the prospect of government authorities rendering a person unconscious, cutting him open, and probing around inside his body for evidence which might, or indeed might not, aid them in convicting him of a crime. It cannot be said that such a procedure involves "virtually no ... trauma." *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836.

The procedure contemplated here goes far beyond the prick of a needle in *Schmerber,* the slight intrusion in *Crowder,* and the minor procedure originally supposed to be required in this matter. The Commonwealth proposes to forcibly subdue petitioner by injection, make a substantial incision into his body, retract muscle tissue in an attempt to locate the subject bullet, and if successful in locating it, extract it from his body. All of this is to be done where the procedure is concededly not medically necessary for the preservation of petitioner's life and health. Considering the scope of the intrusion, the risks involved, and the affront to petitioner's dignity, the Court concludes the procedure contemplated is more akin to the impermissible activity in *Rochin* than to the minor intrusion in *Schmerber.* In short, "These are methods too close to the rack and the screw to permit of constitutional differentiation." *Rochin v. California,* 342 U.S. at 172, 72 S.Ct. at 209.

Considering together the type and extent of physical intrusion and the type and extent of intrusion on petitioner's privacy and dignity, the Court is satisfied that the proposed surgical procedure constitutes an unreasonable search within the meaning of the fourth amendment.

### VI. *Conclusion*

The Court concludes that this action and all parties to it are properly before the Court. The Court further concludes that the proposed surgical procedure would constitute an unreasonable search in violation of petitioner's fourth amendment rights. Accordingly, the Court will permanently enjoin the procedure. While the parties have not raised the question, the Court concludes that the petition does not state a claim against respondents Gerald L. Baliles and the Circuit Court of the City of Richmond, Virginia, Division I; accordingly, they will be dismissed.

An appropriate order will issue.