Rudolph LEE, Jr., Appellee,

v.

Andrew J. WINSTON, Sheriff; Aubrey M. Davis, Jr., Appellants,

and

Gerald Baliles; Circuit Court, City of Richmond, Division I, Defendants.

No. 82–6762.

United States Court of Appeals, Fourth Circuit.

Argued March 9, 1983.

Decided Sept. 14, 1983.

Stacy F. Garrett, III, Deputy Commonwealth's Atty., Richmond, Va. (Aubrey M. Davis, Jr., Commonwealth's Atty., Richmond, Va., on brief), for appellants.

Joseph Ryland Winston, Richmond, Va. (House, Lubman & Davidson, Richmond, Va., on brief), for appellee.

Before WIDENER, PHILLIPS and SPROUSE, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Andrew J. Winston, Sheriff of the City of Richmond, Virginia, and Aubrey M. Davis, Jr., Commonwealth's Attorney for the City of Richmond, Virginia, appeal an order of the district court enjoining them from removing a bullet from the chest of Rudolph Lee and issuing a writ of habeas corpus. The Commonwealth of Virginia moved in state court to compel Lee to undergo surgery for the removal of a bullet believed to be relevant evidence in a criminal investigation. Lee countered by filing a petition for writ of habeas corpus and a complaint under 42 U.S.C. § 1983 against Winston and Davis in federal court, contending that the involuntary removal of the bullet by surgery would violate his fourth amendment right to be free from unreasonable searches. Following a series of hearings in both state and federal courts the district court enjoined Winston and Davis from removing the bullet and also issued a writ of habeas corpus to the extent of precluding custody over Lee for purposes of removing the bullet. Because we agree that the proposed involuntary surgery would be so intrusive as to violate Lee's fourth amendment rights, we affirm the judgment of the district court enjoining, under § 1983, removal of the bullet. Because we conclude that Lee's claim was not one cognizable in habeas corpus under 28 U.S.C. § 2254, we vacate the order issuing the writ.

## I

On July 18, 1982, at approximately 1:00 a.m., Ralph E. Watkinson was closing his business in Richmond when he noticed a man approaching the store from across the street. Seeing that the man was armed, Watkinson drew his own gun and a shootout ensued. Watkinson fired several shots, hitting the stranger in the left side of the body; the stranger returned fire, wounding Watkinson, and then fled into the night.

The police responded immediately, and within twenty minutes they apprehended Rudolph Lee about eight blocks from Watkinson's store. Lee was suffering from a gunshot wound to the left side of his chest. Lee and Watkinson were transported separately to a local hospital where they were placed in the same emergency room by medical personnel. Watkinson, on seeing Lee, exclaimed, "That's the man that shot me."

Lee told police that he had himself been the victim of a robbery by two males, who took his personal property and then shot him in the chest. After investigating Lee's story, the police determined it to be untrue and Lee was charged with four felony counts. The Commonwealth Attorney for the City of Richmond also filed a Motion to Compel Evidence in order to recover surgically the bullet in Lee's chest, an act Lee would not undergo voluntarily.

A series of hearings was held in Richmond Circuit Court on the motion, with Lee represented by counsel at each step. After hearing testimony from the arresting officer, a forensic scientist and the surgeon who would remove the bullet, the court ruled that the bullet could properly be removed. This ruling was based on findings that the bullet, believed to be only one-half centimeter below the skin, could be removed with the use of local anesthesia and with very little risk of harm or injury.[1]

---

1. The court also found that removal of the bullet was justified because the surgery was a minor procedure that would be done in a hospital under medical safeguards to insure Lee's health. Prior to entry of this order Lee had several adversarial hearings, where he was represented by counsel and had a full opportunity to call and examine witnesses. The court also permitted Lee to seek appellate review before the order was enforced.

The court stayed execution of its order to enable Lee to seek appellate review, which he did by way of petitions for writs of habeas corpus and prohibition in the Virginia Supreme Court. That court treated the petition solely as a request for a writ of prohibition and, after considering briefs and argument, upheld the position of the lower court. Lee then filed a petition for a writ of habeas corpus and a suit under 42 U.S.C. § 1983 in federal district court in an attempt to enjoin the state from proceeding with the surgery.

The district court, agreeing that there was virtually no risk of harm to Lee under the circumstances as then presented, denied all relief on October 15, 1982. Preparations were made to remove the bullet at the Medical College of Virginia (MCV) hospital on October 18. The originally slated surgeon, who had testified at the initial state hearing, refused to perform the surgery against Lee's will. A second surgeon was designated, and he ordered the standard battery of pre-surgery tests. X-rays of Lee's chest demonstrated that the bullet was much deeper in the chest wall than initially thought; the bullet was now pinpointed at approximately 2.5 centimeters beneath the skin.

The new surgeon decided that the greater depth of the bullet required the use of general anesthesia in the surgery. Lee's counsel was informed of this, and was also informed that MCV personnel had done a work-up on Lee to determine his fitness to undergo general anesthesia. Lee filed a motion for rehearing in the Richmond Circuit Court on the same day (October 18) that he learned of the changed circumstances, claiming that surgery under the new circumstances would violate his fourth amendment rights.

On October 19, the state court (with a different judge presiding) agreed to hold a hearing on the motion on the morning of October 21. Lee's counsel unsuccessfully requested more time to prepare because of the complex and unfamiliar nature of the evidence relating to general anesthesia. When the hearing commenced on October 21, Lee unsuccessfully moved for a continuance on the ground that he had been unable to obtain an independent expert or develop expertise in anesthesiology in the short time allowed for preparation for the hearing. Lee repeated this same objection twice more during the hearing, to no avail.

The state court again ruled that the surgery could proceed, because there was no material change in circumstances, and Lee again proceeded to federal district court to seek relief in the form of a new trial. After detouring to the Virginia Supreme Court to exhaust state remedies by requesting a rehearing, which was apparently summarily denied, Lee was granted a new hearing by the federal court and given almost two weeks to prepare. At the ensuing hearing in federal court Lee did not present an anesthesiologist, but he did put on a general surgeon who testified about the proposed surgery and the medical risks involved. At this hearing Lee was represented by new counsel, retained in the interval, who was familiar with the areas of medical malpractice and anesthesiology. The state declined to present any further evidence to the federal court.

The district court concluded that surgery under the new circumstances, especially the use of general anesthesia and the necessarily greater intrusion into Lee's body, would constitute an unreasonable search within the meaning of the fourth amendment. The court enjoined the state from taking any steps to recover the bullet involuntarily and issued a writ of habeas corpus of limited scope. The Commonwealth then took this appeal.

## II

Before addressing the merits of Lee's fourth amendment claim, we are faced with the threshold issue of whether the claim should be considered cognizable solely under one or the other of 42 U.S.C. § 1983 and the habeas statute, 28 U.S.C. § 2254, or whether it might properly be cognizable under both. Lee sought relief under both on the basis of the same factual claim, and the district court granted relief under both with

different remedies deemed appropriate to the two.

■ Because of their differing and, in critical respects, conflicting procedural and doctrinal regimes, we decline to treat Lee's claim as one potentially entitling him to relief under both theories. We view Lee's claim as being most directly one seeking to enjoin persons acting under color of state law from depriving a citizen of the United States of a right secured by the Constitution, a claim properly treated as one grounded exclusively in § 1983. We do not consider it properly cognizable in the alternative or in parallel under the habeas statute, 28 U.S.C. § 2254. Because the question is concededly one not free of doubt and because its resolution might control decision here, we pause to give our reason.

Although there may ultimately be an area of limited substantive overlap between § 2254 habeas corpus and § 1983,[2] the main thrusts of the two are obviously quite different. The former is primarily a vehicle for attack by a confined person on the legality of his custody and the traditional remedial scope of the writ has been to secure absolute release—either immediate or conditional—from that custody. *See Preiser v. Rodriguez,* 411 U.S. 475, 484, 93 S.Ct. 1827, 1833, 36 L.Ed.2d 439 (1973). Conversely, § 1983 cannot be used to seek release from illegal physical confinement, *id.* at 475, 93 S.Ct. at 1827; *see also Hamlin v. Warren,* 664 F.2d 29 (4th Cir.1981) (claim under § 1983 for monetary relief for constitutional violation not cognizable without exhaustion as required by § 2254 if favorable judgment would necessarily serve as

binding predicate for habeas release). The remedial scope of § 1983 is obviously much broader than is that of habeas corpus, being available to all citizens and other persons within the jurisdiction of the United States, whether "in custody" or not, and affording to successful claimants the full panoply of traditional equitable and legal remedies to redress actual or potential deprivations of constitutional rights under color of state law.

■ Apart from the differing relief traditionally available under habeas and § 1983, the two remedial statutes are further distinguished by procedures and collateral consequences peculiar to each and, in critical respects, logically incongruent. A contemporary federal habeas petitioner is required to exhaust state remedies and to follow procedural rules that have no § 1983 counterpart. While not generally subject to pleas of res judicata arising from prior state adjudications, he may in respect of fourth amendment claims be foreclosed from habeas relief under *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). A § 1983 complainant, on the other hand, while usually not having to exhaust state remedies, *see Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), is faced—if he does "exhaust"—with the general issue-preclusion doctrine of *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), and must also contend with the still uncertain ramifications of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (§ 1983 relief not available where available

---

2. Whether a precise substantive dividing line is ultimately to be drawn between habeas and § 1983 or whether a degree of overlap in respect of challenges to *conditions* of confinement is inherent in the two is a question not yet definitively resolved by the Supreme Court. Some lower courts hold that habeas lies to correct such conditions, *see, e.g., Albers v. Ralston,* 665 F.2d 812 (8th Cir.1981), while others have held that this is the exclusive domain of § 1983, *see, e.g., Cook v. Hanberry,* 596 F.2d 658 (5th Cir.1979).

In *Preiser v. Rodriguez,* 411 U.S. 475, 499–500, 93 S.Ct. 1827, 1841–1842, 36 L.Ed.2d 439 (1973), the Court recognized that the question

was an open one but specifically declined to lay down firm boundaries between habeas and § 1983. More recently, the Court has stated that "we leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself." *Bell v. Wolfish,* 441 U.S. 520, 527 n. 6, 99 S.Ct. 1861, 1868 n. 6, 60 L.Ed.2d 447 (1979). Because we think that the challenge here is neither to the fact, the length, nor the "condition" of Lee's confinement as the last term has been applied, we are not required to answer that open question here.

state remedies afford constitutionally adequate process).

The present case strongly suggests the existence—at least with respect to factual claims of the type here presented—of an essential dichotomy between the two remedies that precludes application of both to the identical factual claim. By litigating the fourth amendment issue in state court, Lee runs the risk of being precluded from relitigating that issue in a subsequent § 1983 action. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). But if he were able to make the same claim in federal habeas corpus, he would face no such general preclusive effect flowing from state adjudications.[3] The essential procedural incongruity of the two remedial statutes is thus revealed in the fact that doing what must be done to open the federal courthouse door under § 2254 (laying aside the fact that with respect to fourth amendment claims *Stone v. Powell* may close it again) can operate effectively to make the entry provided for the same "claim" by § 1983 the means only of a brief and already doomed visit.

■ Though the essential incongruity is realized procedurally, we believe that it reflects important substantive differences in the two remedies that militate against their pursuit to judgment as alternative or duplicative modes of redress for the same constitutional violation. These differences indeed "demonstrate the continuing illogic of treating federal habeas and § 1983 suits as fungible remedies for constitutional violations." *Allen v. McCurry,* 449 U.S. at 104 n. 24, 101 S.Ct. at 420 n. 24. We therefore think a *judicial* election between the two is required—at least before entry of final judgment[4]—in cases such as the instant one where a claimant seeks in the same action to pursue both remedies to judgment on identical facts.

Lee's claim contains no challenge to the propriety of his present confinement, as confinement; indeed, the record demonstrates ample probable cause to detain Lee and try him for the attempted robbery, and that fact will not be affected by the outcome of this suit. Rather, Lee has initiated this civil proceeding, unrelated to the legality of his confinement, to enjoin a state-authorized search that might infringe his fourth amendment rights. We therefore consider his claim to be one now conclusively shown on the record to be exclusively cognizable under § 1983 and we accordingly now limit our discussion to the application of § 1983 to the facts in issue here.

### III

Treating Lee's claim as one under § 1983 confronts him at the threshold with the fact that the Virginia courts have already decided the dispositive factual/legal issues of his federal claim adversely to him. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), has mandated that col-

---

**3.** In view of our determination that Lee's claim here should be construed as one cognizable only under § 1983, we have no need to consider whether his claim, construed as one for habeas relief, would be foreclosed by the *Stone v. Powell* principle though not by general principles of res judicata. We observe only that the question would be an open one. The fourth amendment issue here was not litigated in application of the exclusionary rule to evidence already obtained by search, but in determining whether a search might be made. The *Stone* rationale is of course rested largely upon the conclusion that relitigation of fourth amendment claims in federal habeas proceedings is not likely to have prophylactic effect on police conduct—the basic justification for the exclusionary rule. Whether that rationale applies as well to a pre-search adjudication of fourth amendment

issues is a question that can be reserved for another day.

**4.** In view of the uncertainty that still obtains in drawing a clear substantive line between the two remedies, claimants should no more be forced to any procedural "election of remedies" here than in other situations. *See* Fed.R.Civ.P. 8(e)(2). Factual development may be required in close cases to determine the statute under which a particular claim is cognizable, if cognizable under either. As in other contexts, judicial "election" may be deferred to the point of judgment. Obviously, the "label" put by a claimant upon a statement of claim is, in any event, not conclusive upon the court in assessing whether it is legally cognizable as the one or the other. *See, e.g., Hamlin v. Warren,* 664 F.2d 29 (4th Cir.1981).

lateral estoppel doctrine should apply to attempts by a § 1983 claimant to relitigate issues of fact or law decided adversely to him in state criminal proceedings, subject to the traditional exception, *inter alia,* that collateral estoppel will not be applied when the party against whom the estoppel is asserted did not have a "full and fair opportunity" to litigate the claim below, *id.* at 95, 101 S.Ct. at 415.

The *McCurry* rationale for application to § 1983 claims of collateral estoppel doctrine has since been elaborated in important respects in *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). *Kremer* held that when, as here, a federal court is asked to give preclusive effect to a prior state judgment, the federal courts are bound by the statutory directive of 28 U.S.C. § 1738 "to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer,* 456 U.S. at 466, 102 S.Ct. at 1889.[5] *Kremer* also fleshed out the *McCurry* proviso that to have issue-preclusive effect the prior state proceeding must have afforded a full and fair opportunity to litigate: "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full-faith-and-credit guaranteed by [§ 1738]," *id.* at 481, 102 S.Ct. at 1897.

Guided by *McCurry* and *Kremer,* we therefore look first to the possibly preclusive effect of the state court judgments denying Lee the relief he now seeks in federal court under § 1983.

(A)

The first inquiry under *Kremer,* 456 U.S. at 466, 102 S.Ct. at 1889, is whether, and to what extent, the courts of Virginia would themselves give preclusive effect to the state court ruling in this case. If the Virginia courts would not give it preclusive effect, we in turn have no obligation to do so; if they would, we must.

The more specific inquiry is the preclusive effect if any that would be given by Virginia courts to a ruling on a Motion to Compel Evidence (which we view as analogous to a suppression motion for purposes of analysis) issued in the preliminary stages of a criminal prosecution. We can find no Virginia decision that has addressed this precise question, nor can we discern a plain answer from the Virginia decisions dealing more generally with collateral estoppel doctrine.

The general rule in Virginia is that criminal judgments of conviction or acquittal have no preclusive effect in subsequent civil litigation. *See Luke Construction Co. v. Simpkins,* 223 Va. 387, 291 S.E.2d 204 (1982). This general rule of non-preclusion, which has been followed in Virginia since 1916, *see Prosise v. Haring,* 667 F.2d 1133, 1138–39 (4th Cir.1981), *aff'd,* —— U.S. ——, ——————, 103 S.Ct. 2368, 2374–75, 76 L.Ed.2d 595 (1983) (discussing Virginia cases), is based upon Virginia's requirement of mutuality of estoppel and its recognition that "the parties in a criminal proceeding are not the same as those in a civil proceeding and there is a consequent lack of mutuality." *Smith v. New Dixie Lines,* 201 Va. 466, 472, 111 S.E.2d 434, 438 (1959) (citing cases). Although the Virginia Supreme Court has been invited several times in recent years to discard this general

---

5. The *Kremer* Court clarified the source of the res judicata effect of state court judgments as being wholly statutory: "It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments." 456 U.S. at 480–81, 102 S.Ct. at 1896–97. After *Kremer* it appeared settled that there was no independent law of federal res judicata applicable to state court judgments, but that § 1738 preempted the matter by its command that

federal courts treat state judgments as would other courts in the state rendering judgment, i.e., according to the state law of res judicata. More recently, however, the Supreme Court in *Haring v. Prosise,* —— U.S. ——, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983), intimated that some issues, though fully adjudicated and thus preclusive under state law, may nevertheless be relitigated in a federal § 1983 action. *Id.,* at ——, 103 S.Ct. at 2375. *See infra* n. 7.

requirement of mutuality, it has specifically declined to do so. *See, e.g., Nero v. Ferris,* 222 Va. 807, 284 S.E.2d 828 (1981); *Norfolk & Western Railway v. Bailey Lumber Co.,* 221 Va. 638, 272 S.E.2d 217 (1980).

These general rules of non-preclusion and mutuality in respect of criminal judgments are apparently not absolute, however. Virginia has recognized at least one narrow exception—a convicted arsonist has been held precluded by the conviction from suing on a fire insurance policy insuring the building he burned. *Eagle, Star & British Dominions Insurance Co. v. Heller,* 149 Va. 82, 140 S.E. 314 (1927).[6] And there is some recent indication that the mutuality requirement will be more rigorously applied to situations involving the use of offensive collateral estoppel, *see Norfolk & Western Railway v. Bailey Lumber Co.,* 221 Va. at 641–42, 272 S.E.2d at 219–20, than to those, such as in the instant case, where the doctrine would be invoked defensively. Indeed, the Virginia Supreme Court has recently stated that mutuality is not to be applied "mechanistically," and that non-mutual defensive preclusion may be appropriate when it is "compellingly clear" that the estopped party previously had a full and fair opportunity to litigate the issue. *Bates v. Devers,* 214 Va. 667, 671 n. 7, 202 S.E.2d 917, 921 n. 7 (1974).

In addition to their generally uncertain implications for the mutuality requirement, none of these Virginia decisions dealt with the exact situation confronting us here. We do not have a criminal judgment of acquittal or conviction by adjudication or guilty plea, but rather an order based wholly upon a pretrial ruling on a fourth amendment issue. There are, in consequence, still other uncertainties about the present state of Virginia law on collateral estoppel in the context of this case. There is a possible question of the "finality" of this order for res judicata purposes, though no question of its finality for purposes of direct appeal in the state proceedings was raised by the parties or by the Virginia courts *sua sponte.* There is also a question—unresolved in the Virginia courts so far as we are aware— whether the federal defendants here might be considered sufficiently in privity with the state in the state criminal prosecution to overcome any lack of mutuality that would otherwise prevent issue preclusion under state law.

Our resulting uncertainty about how the Virginia courts would resolve the preclusion issue, if presented to them directly, makes us hesitant to rest decision here on any conclusion that Virginia would or would not ordinarily give collateral estoppel effect to such an order. *But cf. Haring v. Prosise,* —— U.S. at —— n. 10, 103 S.Ct. at 2375 n. 10 (reasonable interpretation of Virginia law is that a state criminal conviction has no preclusive effect in § 1983).

### (B)

■ Assuming therefore, without deciding, that the state court order here on the Motion to Compel Evidence would ordinarily be given preclusive effect by Virginia courts, we nevertheless decline to give it such effect in this case. Under § 1738, we are required to give state proceedings full faith and credit only if—all other state law predicates for issue preclusion being present—those proceedings satisfy the minimum procedural due process requirements of the fourteenth amendment. *Kremer,* 456 U.S. at 481–82, 102 S.Ct. at 1897–98.[7]

---

6. *Heller* has always been considered by the Virginia courts to be simply a special exception to the general rule against preclusions in respect of criminal judgments. *See Haring v. Prosise,* —— U.S. ——, —— n. 10, 103 S.Ct. 2368, 2375 n. 10, 76 L.Ed.2d 595 (1983). But a recent Virginia Supreme Court case has cited *Heller,* in discussing exceptions to the mutuality requirement, with the following parenthetical: "(exception justified, doctrine [of collateral estoppel] invoked defensively)." *Luke Con-*

*struction Co. v. Simpkins,* 223 Va. at 389, 291 S.E.2d at 205.

7. Under *Kremer,* we should first inquire whether Virginia courts would decide there had been so insufficient an opportunity to litigate the issue that, while not necessarily unconstitutional, the judgment would not be recognized by other state courts. Our research has revealed no Virginia case law on this issue. The Virginia Supreme Court did review the state court order on one occasion and declined to rehear it

■ We hold that Lee was denied procedural fairness here, in that, despite several pleas for continuance, he was given insufficient time in the state court proceedings to prepare an important and technically complex issue of constitutional dimension.

■ *Powell v. Alabama,* 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932), established that states are required by the fourteenth amendment to provide criminal defendants sufficient time to prepare their defense. Rulings on motions for continuance sought for purposes of defensive preparation are usually within the sound discretion of the trial court, *Shirley v. North Carolina,* 528 F.2d 819 (4th Cir.1975), but the denial of a request for more time constitutes a violation of due process if it arbitrarily and unfairly hinders the defendant's ability to present his case. The Supreme Court, in *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964), addressed the issue:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

(Citations omitted.)

As *Ungar* points out, not every abusive denial of a continuance amounts to a due process violation. To determine whether denial of continuance had that unconstitutional effect courts must assess whether the defendant was nevertheless afforded a reasonable time to prepare a defense and an adequate opportunity to call witnesses, *see id.* at 589 n. 9, 84 S.Ct. at 849 n. 9; the diligence of counsel in requesting the motion and in attempting to procure evidence in a timely fashion, *see Shirley,* 528 F.2d at 822; and whether unobtained evidence would have been materially helpful to the party or merely cumulative, *see Hicks v. Wainwright,* 633 F.2d 1146, 1149 (5th Cir. 1981).[8] Because a claim in federal court of fundamental unfairness in state proceedings is a serious and sensitive one, we review the record at this point in some detail.

Lee's counsel filed a motion for rehearing on October 18, the day he was informed of the changed circumstances regarding the removal of the bullet. On October 19, the Richmond Circuit Court ordered that a hearing on the motion be held two days

a second time. We do not know from the record whether that court was presented with the specific claim of insufficient opportunity to litigate. In the absence of such an indication, we are reluctant even to assume a difference of view on the matter between our court and the Supreme Court of Virginia if the latter court had been presented with the same challenge we consider. For purposes of decision in this case only, we assume, *arguendo,* that the state court would have rejected, as a matter of state law respecting the enforcement of judgments, such an attack upon the order here in issue. We do so only because we could not in fairness to the state court *rest decision* here on a contrary assumption.

We note that *Kremer*'s mandate is to give *state judgments preclusive effect unless the* state proceedings did not accord the participants minimum procedural due process; if minimum due process was not so accorded, the state courts themselves could not give preclusive effect to the prior state determination. Recently, in *Haring v. Prosise,* —— U.S. at ——, 103 S.Ct. at 2375, the Supreme Court intimated that there are certain cases where relitigation of issues in a federal § 1983 action is permissible, even though those issues would be given preclusive effect by the state courts. We think this area of permissible relitigation as yet too undefined to be a proper ground for decision, and we need not explore the issue because of our holding that due process was not accorded in this proceeding.

8. While the cited cases are post-conviction habeas cases, they are applicable to the present case on the issue of whether a constitutionally sufficient time to prepare was granted.

thence, on October 21.[9] Lee unsuccessfully requested more time to prepare. On October 20, Lee requested that three doctors at MCV be subpoenaed to appear at the hearing. These doctors, two surgeons and an anesthesiologist, were engaged by the Commonwealth in connection with the removal of the bullet.

During the two-day period allowed for preparation of the motion, Lee's counsel was able to review the medical record, interview briefly two of the three doctors who had been subpoenaed (including the anesthesiologist),[10] do some preliminary medical research, and make initial contact with an independent anesthesiologist. We are satisfied from the record that counsel was not able, despite obviously diligent effort, to obtain an independent review of the medical record by outside physicians nor was he able to consult with the independent expert in anesthesiology in order to prepare a presentation on the risks of general anesthesia.

On the morning of the hearing, Lee's counsel requested a continuance because he felt "totally unprepared" to examine the anesthesiologist from MCV and because he had not had an opportunity to consult with an independent anesthesiologist in order to put together a cogent presentation. In response, the state court stated flatly that the hearing would proceed promptly as scheduled. Counsel put on the anesthesiologist who had done the work-up on Lee and also put on the surgeon who had refused to proceed with the involuntary surgery.

At the end of this evidence, just prior to the lunch recess, counsel again requested more time in order to obtain independent expert advice on the use of general anesthesia. He again stated that he had been unable to procure expert help because of time constraints and further that he was unhappy with the testimony of the expert anesthesiologist, who was employed by the Commonwealth. The court, after determining that Lee did not have an expert available, stated that if an expert could be found, "we will hear him at two o'clock if you have him; otherwise we'll hear your argument."

When court resumed at two o'clock, the court asked for any further evidence from Lee. Counsel explained that he had contacted the independent anesthesiologist with whom he had earlier made contact, but that she was unable to be there that day at two o'clock. He had also attempted to contact another anesthesiologist but was unable to do so. Counsel was unable to make a proffer of what the expected testimony would be, because he had not yet consulted them, but requested an opportunity to meet with the anesthesiologists and then present their testimony.

Lee's specific contention of fundamental unfairness is that he had insufficient time to prepare his case and inadequate time to produce his witnesses.[11] We agree with this contention. The case at that juncture presented novel and complex issues with which few attorneys would be immediately familiar. There had been several rounds of

9. The record indicates that October 21 was chosen simply because that day had earlier been set for the trial on the merits. A "myopic insistence upon expeditiousness" was the specific vice identified in *Ungar,* 376 U.S. at 589, 84 S.Ct. at 849, as the cause of unfairness.

10. Counsel did interview, on October 20, the anesthesiology expert who had done the anesthesia work-up on Lee. This expert had not seen the X-rays of Lee taken on October 18 at the time he did the work-up, and he concluded that a local anesthetic would suffice for the job. The expert subsequently saw the X-rays, but Lee's counsel was able to speak with him about the new circumstances for only a short time on the morning the hearing was held.

11. The defendants would make much of the fact that Lee did not subpoena the independent anesthesiologist he had contacted during the two-day preparation period, although he did subpoena three doctors from MCV who were working on the case. They also point out that Lee's counsel did not make an offer of proof concerning his independent expert's testimony. These contentions largely miss the point. Lee's claim was that he had insufficient time to *consult* with an expert in order to prepare his case properly. We find it neither surprising nor legally significant that Lee's counsel did not subpoena the witness or make an offer of proof when he had not consulted with the expert to determine what the important issues were and what the expert's testimony would be.

hearings before this time, and counsel could be expected to be familiar with the issues raised there, but the events of October 18 injected new and crucial issues into the case—the effect of the greater depth of the bullet and resulting need to use general anesthesia.

There is not, and cannot be, any suggestion that counsel was less than diligent in attempting to put together his case. Two days is short time to accomplish what in fact was done. The record also demonstrates that counsel made timely and repeated requests for more time. The record does not disclose any reason why more time was not granted, except that the time of the compelled hearing was the time previously set for the actual trial of the case.

Nor does the record indicate why the state court denied counsel adequate opportunity to consult with an independent expert in order to gain some expertise and to present the expert's testimony if appropriate. The court indicated that there was no reason to believe that the anesthesiologist who testified was less than believable, but we think this misses the mark. The denial of adequate time to consult with an independent expert infringed a basic right of Lee's—the right to receive *meaningful* assistance of counsel. This is especially true in a case like this, involving a complex medical issue that is beyond the immediate ken of most lawyers and that can only be illuminated for counsel by consultation with experts in the field. Although the anesthesiologist who did testify under subpoena for Lee was no doubt truthful, he was employed by the state—Lee's adversary in this proceeding—and counsel indicated his belief that this expert's testimony was incomplete. To deny Lee the right to consult with and present suitable independent expert witnesses deprived him of a fundamental resource for adequate representation in the adversarial proceeding he faced.

A review of the presentation by Lee's counsel in the federal district court demonstrates that the state court's denial of more time to prepare and consult experts had an adverse effect on Lee's ability through his state court counsel to present his case in state court. Lee retained second counsel, experienced in the areas of medical malpractice and anesthesiology, to handle the case in federal court. Counsel were given almost two weeks to prepare for this new proceeding. In the federal proceeding Lee presented as an expert witness a general surgeon knowledgeable in the areas of surgery and anesthesiology who was not connected in any way with the state's attempt to retrieve the bullet. Counsel's questioning of this expert was crisp and effective, demonstrating a degree of understanding of the medical/legal issues that any fair reading of the two records will convince was simply not possessed by Lee's state court counsel. It does not denigrate Lee's state court counsel a whit—indeed we think his performance under the circumstances was exemplary—to emphasize that federal court counsel was able to give Lee much more effective representation.[12] The point is simply that the different degrees of effectiveness based upon the manifest differences in depth of understanding and preparation are the most cogent possible evidence of the degree of prejudice and unfairness resulting to Lee from the state court's denial to his counsel at that time of the opportunity for preparation vouchsafed his federal court counsel.

We conclude that on the peculiar facts of this case, the state court's denial of more time to prepare was "so arbitrary and so fundamentally unfair as to invoke the Constitution." *Shirley v. North Carolina*, 528 F.2d at 822; *see also Hicks v. Wainwright*, 633 F.2d at 1149–50. The arbitrary truncation of preparation time deprived Lee of a fair opportunity to determine the crucial

---

12. Defendants contend that Lee's failure to produce an anesthesiologist at the hearing in federal court demonstrates that he was not denied a fair opportunity to litigate in the prior state proceeding by his claimed inability to present an anesthesiologist there. Again, as with Lee's failure to subpoena the anesthesiologist in the state proceeding, this essentially misses the point by construing Lee's objection to the state proceeding too narrowly as going only to his inability to present a specific witness. *See supra*, note 8.

factors relevant to his claim and to obtain independent expert witnesses to testify about those factors. This constituted a deprivation of the due process of law guaranteed by the fourteenth amendment, *see Ungar v. Sarafite,* 376 U.S. at 589 n. 9, 84 S.Ct. at 849 n. 9, and rendered the state proceeding constitutionally infirm.

As *Kremer* indicates, 456 U.S. at 482, 102 S.Ct. at 1898, neither state nor federal courts may grant preclusive effect to a prior judgment rendered in a hearing conducted without constitutionally mandated due process protections. Because the second state proceeding in this case was so conducted, we give the resulting order no preclusive effect in this § 1983 action. *Cf. Bickham v. Lashof,* 620 F.2d 1238, 1246 (7th Cir.1980) (denial of "opportunity for a meaningful hearing" in state court renders state judgment non-preclusive in subsequent § 1983 action).

### IV

Unbound by any determinations of fact or law made in the prior state court proceedings, we now address Lee's fourth amendment claim. The fourth amendment insures the right of all people—accused robbers and citizens in the free society alike—"to be secure in their *persons* . . . against unreasonable searches and seizures" (emphasis added). The question in this case, simply put, is whether the proposed involuntary surgery under general anesthesia would be so invasive that it would constitute a constitutionally unreasonable search of Lee's person.

While fourth amendment questions are peculiarly fact-specific, and this case is no exception, there is a sufficient body of case law on bullet removal from which we can draw guidance as to general principles. *See, e.g., United States v. Crowder,* 543 F.2d 312 (D.C.Cir.1976) (en banc); *State v. Allen,* 277 S.C. 595, 291 S.E.2d 459 (Sup.Ct.

1982) (discussing cases). The basic principle is that, once the state has demonstrated the relevancy of evidence and the inability to obtain it otherwise, the reasonableness of removing it forcibly from a person's body is judged by the extent of the surgical intrusion and the extent of the risks to the subject. *See, e.g., Crowder,* 543 F.2d at 316.

The authoritative cases have recognized that the controlling principles in this area are those enunciated in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).[13] *Schmerber* and *Rochin* essentially demonstrate the terminal points on the range of permissible and impermissible police practices in body searches of the type here in issue. *Schmerber,* upholding the admissibility of test results done on blood involuntarily removed from a defendant, cautioned that only minor intrusions on the sanctity of the individual would be permitted:

> The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States' minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

384 U.S. at 772, 86 S.Ct. at 1836. At the other end, the *Rochin* Court, in condemning the use of stomach-pumping to extract evidence, instructed courts to exercise their judgment in scrutinizing police practices "in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even towards those charged with the most heinous offenses." 342 U.S. at 169, 77 S.Ct. at 208 (quoting *Malinski v. New York,* 324 U.S. 401, 416–17, 65 S.Ct. 781, 788–89, 89 L.Ed. 1029 (1945)).

---

13. *Rochin* was decided on "substantive" due process grounds before *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), had extended the reach of fourth amendment protections to state action. But its standard for

gauging the fundamental fairness of bodily intrusions under due process guarantees applies as well to gauging the reasonableness of body searches under fourth amendment guarantees.

The task here, in assessing the state's request to proceed with the surgery, is therefore to determine whether this is a minor intrusion permissible under *Schmerber* or whether it is beyond the pale of permissible police intrusions and thus condemned by *Rochin*. We conclude that under the facts of this case the intrusion is so extensive and generates such risk and uncertainty that the surgery cannot be allowed to proceed. Unlike the procedure in *Schmerber*, which presented "virtually no risk, trauma, or pain," 384 U.S. at 771, 86 S.Ct. at 1836, the procedure in this case has the potential to inflict all three.

The medical experts in this case agree that the bullet in Lee's chest normally would not be removed, but would be left in the chest indefinitely. The bullet is lodged approximately 2.5–3 centimeters deep in muscle tissue in the chest, and would require an incision of 5 centimeters to permit extraction. One surgeon testified that it is difficult to discover the exact location of foreign bodies in muscle tissue, and this difficulty could require extensive probing and retracting of the muscle tissue. This surgical penetration of the chest muscle tissue carries with it the concomitant risks of injury to the muscle as well as injury to the nerves, blood vessels and other tissue in the chest and pleural cavity. Of course, the greater intrusion and the larger incisions increase the risks of infection.

Beyond the extensive nature of the physical intrusion itself, there must also be taken into account the fact that the procedure will require administration of general anesthesia.[14] Medical experts testified that Lee was a good candidate for general anesthesia and in fact had been subjected to it previously. The experts also testified that the general risks of harm or death from general anesthesia are quite low, and that Lee was in the statistical group of persons with the lowest risk of injury from general anesthesia.

Though the specific physical risks from putting Lee under general anesthesia may therefore be considered minimal, it bears contemplating what this procedure itself involves when imposed involuntarily upon any citizen in our free society whatever his general physical condition may be. Lee—or anyone else—would, on the undisputed medical testimony in this record, have first to undergo a battery of preliminary testing in order to have the anesthesia properly administered. He would then be injected with a sedative—probably morphine—in order to relax him. Next, he would be given sodium pentathol, a barbiturate, in order to put him to sleep. While unconscious, he would continuously receive a gaseous mixture of oxygen and nitrous oxide to insure that he remained anesthetized. An anesthesiologist would be present at all times to insure that he was breathing properly and that all other vital functions were normal, a necessary medical precaution because all anesthetics have the potential to depress vital functions.

While the statistical risk of actual physical harm to Lee from all this is perhaps very low, the actual risk is of course unknown. This uncertainty in computing the risk is compounded by the disagreement among the medical experts about the exact nature and scope of the operation. For example, one surgeon testified that the procedure, excluding the anesthesia, would take only 15–20 minutes; another surgeon predicted the procedure could take up to 2½ hours to complete. An expert testified that there was virtually no risk of muscle or tissue damage; another stated that these problems were possibilities. Several doctors testified that the procedure would be considered "minor surgery"; another doctor claimed that there was no such thing as minor surgery.

We agree with the district court that a medical designation of this procedure as minor surgery is not controlling, because

---

14. We assume—as we must on the record presented—that general anesthesia would definitely be used in the surgery if allowed to proceed. The surgeon designated to do the surgery has stated that he will operate under general anesthesia, and the parties all agree that general anesthesia will be used.

"there is no reason to suppose that the definition of a medical term of art should coincide with the parameters of a constitutional standard." *Lee v. Winston,* 551 F.Supp. 247, 260 (E.D.Va.1982). The judicial inquiry is not to make the medical estimate in medical terms, but is whether, under the totality of the circumstances presented, the procedure proposed by the state is constitutionally unreasonable. Viewed starkly, the state proposes to drug this citizen—not yet convicted of a criminal offense—with narcotics and barbiturates into a state of unconsciousness, then surgically to open his chest and there to explore for a bullet that may or may not be probative in the trial of the crimes with which he is charged.[15] We hold that this goes beyond the police practices which the state can legitimately undertake within the bounds of the fourth amendment.

As recognized and insured by that amendment, our people prize the freedom from unreasonable government intrusions upon bodily security and personal privacy as highly as any right or liberty that we enjoy. The proposed surgery is too intrusive and presents too great a risk—to this defendant and to the privacy interests of a free society—to be condoned as permissible police practice in enforcing the criminal laws.

In sum, we agree with the district court's evaluation:

The procedure contemplated here goes far beyond the prick of a needle in *Schmerber,* the slight intrusion in *Crowder,* and the minor procedure originally supposed to be required in this matter. The Commonwealth proposes to forcibly subdue petitioner by injection, make a substantial incision into his body, retract muscle tissue in an attempt to locate the subject bullet, and if successful in locating it, extract it from his body. All of this is to be done where the procedure is concededly not medically necessary for the preservation of petitioner's life and health. Considering the scope of the intrusion, the risks involved, and the affront to petitioner's dignity, the Court concludes the procedure contemplated is more akin to the impermissible activity in *Rochin* than to the minor intrusion in *Schmerber.* In short, "These are methods too close to the rack and the screw to permit of constitutional differentiation." *Rochin v. California,* 342 U.S. at 172, 72 S.Ct. at 209.

551 F.Supp. at 261.

## V

In conclusion, we summarize.

Lee's request to enjoin the proposed surgery is properly treated exclusively as a claim under § 1983 to protect against the deprivation of a constitutional right. Because Lee did not receive a full and fair opportunity to present his claim in state court, the federal courts are not bound in this action under § 1983 by the prior state court ruling adverse to his claim of right. In assessing *de novo* Lee's claim of constitutional deprivation, we agree with the judgment of the district court that the proposed surgical procedure would constitute an unreasonable search in violation of Lee's fourth amendment rights. The judgment permanently enjoining the defendants and their agents from proceeding with the surgery must accordingly be affirmed. Because the claim was not properly cognizable as a petition for habeas corpus under 28 U.S.C. § 2254, the district court's order granting the writ must be vacated.

IT IS SO ORDERED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

---

**15.** A forensic sciences expert testified that the bullet may be unidentifiable, even as to caliber, if it is removed from Lee's chest. A bullet inside the human body deteriorates, the rate of deterioration dependent upon the time the bullet is inside the body and also upon the body chemistry of the wounded person. This deterioration can also be hastened if the wounded person takes medication. Also, lead bullets deteriorate much more rapidly than other kinds; the bullets fired from Watkinson's gun were determined to be solid lead. The bullet has already been in Lee's chest for approximately nine months.

## I

*Schmerber, infra,* has decided that an involuntary intrusion, made under protest, and even unaccompanied by court order or other process, into the human body is not necessarily a violation of the Fourth Amendment protection against unreasonable searches and seizures from the person. What we have to decide is whether a perfectly routine surgical procedure to extract a bullet nine-tenths of an inch below the surface of the skin imbedded in the deltoid muscle near the left collarbone violates the Fourth Amendment when accomplished under a general anesthetic.

Among the many remarkable things about this case is the fact that the most nearly controlling authority is *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), which is nowhere mentioned in the opinion of the majority. Neither is the allied case of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). While the explanation may be that the Commonwealth did not rely upon those cases in its brief, the doctrine of federal courts not interfering in ongoing state criminal prosecutions is so firmly imbedded in our jurisprudence that a decision authorizing such interference cannot be said, I think, to have been considered fully without stating the authority for its action. Absent judicial authority, 28 U.S.C. § 2283, literally read, of course would bar a federal court from staying the state court criminal proceeding, although *Younger* did not proceed on that premise, 401 U.S. at 54, 91 S.Ct. at 755. Even considering that suits under § 1983 have been held to be excepted from the prohibition of § 2283 in *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), *Perez,* like *Younger,* did not rely upon § 2283 for its authority. Rather, as its reason for reversing injunctive interference with an ongoing state criminal prosecution, it described a federal court's suppression of evidence in a pending state criminal prosecution: "It is difficult to imagine a more disruptive interference with the operation of the state criminal process short of an injunction against all state proceedings." 401 U.S. at 84, 91 S.Ct.

at 676. And *Perez* differed factually from the case at hand only to the extent that in *Perez* the evidence previously seized by the state (obscene literature) was sought to be suppressed, while here it is the very search itself. So the rule of the *Perez* case must be followed or else the disruptive interference with the operation of the state criminal process may not be authorized in any event.

*Perez,* in discussion, gave the rule for an occasion permitting such interference as follows: "Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction or perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate." 401 U.S. at p. 85, 91 S.Ct. at p. 677. There is no harassment in this case, and no prosecution undertaken by the Commonwealth without hope of obtaining a valid conviction. Thus, we must have, to permit relief, "extraordinary circumstances where irreparable injury can be shown." The irreparable injury of course cannot be the mere fact of a criminal prosecution. *Younger,* 401 U.S. at pp. 46–47, 91 S.Ct. at pp. 751–52. And it cannot be the mere intrusion into the body. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). As a matter of law, then, the extent of the intrusion must decide whether or not the injury is irreparable, and I think the standard is the same whether the case be considered under § 1983 or as one in habeas corpus.

## II

Before passing, I should note that I do not agree that Lee did not have a full and fair opportunity to present his case in the state court. The majority, as did the district court, bases the lack of full and fair opportunity solely on the failure to grant a continuance to get another anesthesiologist to, and prepare for the testimony at, the hearing. The attorney involved at the time of the second hearing in the state court had been employed in the case for more than

ten weeks. Remembering that the hearing in question was on October 21st, the attorney had told the court on August 11th that he had completed his investigation of the facts of the case but had not completed researching the law, and he asked for and was given a continuance of two weeks at that time for that purpose. He had already appeared at the first hearing in the state court and at a subsequent hearing in the district court, and in the Virginia Supreme Court, with respect to the very matter at hand. So any suggestion that he was not prepared as to the law of the case is so patently without merit that I take no stock in it whatsoever.

So far as being unable to examine or cross examine properly an anesthesiologist, the record speaks for itself, and is an entire contradiction of the fact finding of the majority as well as that of the district court. It is true that the attorney did not have at hand the consulting anesthesiologist he wanted to testify, for whom no subpoena had been issued, and whom he has been found by the majority and the district court unable to examine or cross examine properly. But he did better than that. He called as a witness Dr. C. Paul Boyan, who must be accepted as the prisoner's treating physician and *who had not testified before in the case on behalf of anyone.* Dr. Boyan was Professor Emeritus in the Department of anesthesiology in the Medical College of Virginia. Prior to becoming an anesthesiologist, Dr. Boyan had been a field surgeon with the Red Cross during World War II, treating the wounded as a surgeon and was familiar with the removal of bullets. He had performed the function of anesthesiologist in about 100,000 operations and had never lost a patient. To say that Dr. Boyan was vastly skilled and experienced in the exact procedure then in question before the court would be understatement. Not only that, Dr. Boyan had examined the patient and was one of the anesthesiologists who had been selected to administer the anesthetic at the operation. At the conclusion of the hearing in the state court, the attorney indicated that he yet wished to call an independent anesthesiologist, the one that

was unavailable that morning. Yet, he did not even contend to the court that any of Dr. Boyan's answers were not absolutely truthful, and his only objection was that Dr. Boyan couldn't quantify some statistics that the attorney's reading of a text on anesthesiology told him should have been quantifiable. Indeed, the anesthesiologist whom he wanted to call was also on the staff of M.C.V.

The attorney's examination of Dr. Boyan reveals anything but the inadequacy of an unprepared attorney, while decried in terms, necessarily implied by the majority opinion. It was skilled, precise, and correct, and displayed knowledge of the field in which inquiry was being made. *I invite especially the reading of pages N–39 through N–66 of the appendix.* The same may be said about his examination of Dr. Mendez-Picon who was called as a witness on behalf of the defendant at the second hearing in the state court. Dr. Mendez-Picon had previously testified for the Commonwealth at the first hearing in the state court. No problem existed with getting a surgeon to the second hearing on behalf of the defendant, for one had been called as a witness but was stopped from attending at the instance of the attorney. Remarkably, this physician also was on the staff of M.C.V. and was the one designated to perform the operation after Dr. Mendez-Picon withdrew.

As there may be no suit complaining of a statute alleging its constitutional invalidity unless the plaintiff has been injured by its operation, *Ashwander v. TVA,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Justice Brandeis concurring at p. 347, 56 S.Ct. at p. 483), it also has to be the law that a due process violation may not be prosecuted unless the complaining party has been injured by not receiving the process he was due. On similar if less exaggerated facts, *Unger v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), held there was no due process violation. Even if the attorney's examination of Dr. Boyan is not adequate to refute such a contention, and I think that it is, then the other facts do. The same

attorney at the later hearing in the federal court did not call any anesthesiologist at all, although he had talked to four more by that time (one of whom had been consulted by the Commonwealth and declined to testify) and although he had employed associate counsel described by the majority as experienced in the areas of medical malpractice and anesthesiology. The setting would not be complete without mentioning that the district court based its critical fact finding "entirely from the transcript of the state court proceedings of October 21." It found that the additional evidence submitted in the federal court was either cumulative or in the case of the X-ray prints incomprehensible.[1] And I note especially at this point that the district judge before making those findings had seen the defendant's only additional witness, a surgeon, and heard him testify. It formed its factual conclusions "looking in the same body of evidence [as in the state court record]."

I thus insist that Lee received all the process he was due in the state court proceeding and that even if the failure to continue the case by the state judge was too peremptory, then Lee was not harmed by it. The record I think will admit of no other conclusion.

I will, for now, accept the premise of the panel majority and the district court that Virginia courts would give collateral estoppel effect to the finding of the state courts and their premise that *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), would bar reexamination of the issue in a suit under § 1983 if a fair opportunity to try the issue were presented.

A fair reading of the Virginia Supreme Court's order indicates that it is a decision on the merits of the Fourth Amendment claim adverse to the prisoner, and the Commonwealth concedes that at oral argument. If the rule in *Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976), is that no Fourth Amendment claims will be considered in federal habeas corpus collateral review of state searches, rather routing all of them through the state courts and then to the Supreme Court of the United States, then the failure of the petitioner to ask the Supreme Court for a stay of the Virginia Supreme Court's order and to petition for certiorari would mean that an inferior federal habeas court may not consider the merits of the claim. The prisoner was no farther away from an appointment to consider a stay of the Virginia Supreme Court's order than the nearest telephone. When, however, we consider that *Stone* placed emphasis on the lack of deterrent effect on officers by collateral federal post conviction review, months or even years later, then this underpinning of *Stone* is not present in this case, and federal habeas corpus review might not be barred by that decision. I think that so far as a claim of intrusion into the human body is concerned, properly presented and developed before conviction, as here, that the Supreme Court would decide that *Stone v. Powell* did not bar federal habeas corpus review of that question and apply it on those special facts only to post conviction review of the same subject matter.

I agree in part with the district court, however, in its analysis of the habeas corpus question and not with the panel majority. Lee had exhausted his state remedies by the decision on the merits by the Virginia Supreme Court. I accept the analysis of

---

1. The majority relies on the testimony of the surgeon (a specialist in vasectomy we are told) who testified at the second federal habeas corpus hearing to set up inconsistencies in expert testimony, the principal of which is the length of the operation caused by the uncertainty of the location of the bullet even with X-rays. Dr. Boyan knew exactly where the bullet was even without X-rays the first time he saw the patient. Dr. Mendez-Picon knew exactly where the bullet was with the aid of X-rays, although he had at first mistaken scar tissue for the bullet, which Dr. Boyan had not. The rejection by the district court of this testimony for whatever reason is well justified by the medical authorities which indicate that the location of bullets by X-ray or CT scan may be precisely accomplished. See, e.g., J. Lee, M.D., S. Sagel, M.D., & R. Stanley, M.D., eds., *Computed Body Tomography* 496 (N.Y.1983); J. Haaga, M.D. & N. Reich, D.O., *Computed Tomography of Abdominal Abnormalities* 270–72 (St. Louis 1978).

the district court that custody for one purpose is not necessarily custody for another and being held in jail to answer for a crime is not the same as being held in jail to answer for a crime and also submit to involuntary surgery. I also accept the analysis of the district court that the only fact finding of the state court which carries with it the presumption of correctness under § 2254 is that there was no material difference in the facts brought out at the first and second hearings in the state court. I also will accept its conclusion that the facts are different. The bullet at the second hearing was shown to be slightly less than an inch deep, while at the first hearing the depth it was imbedded in Lee's muscle tissue was thought to be about two-tenths of an inch deep. The requirement of a general anesthetic was indicated only at the second hearing. So whether there was any difference in risk in removal of the bullet some seven-tenths of an inch deeper was the proper subject of analysis by the district court, I think, for the risk to the one being operated on is what must be analyzed under the cases in order to ascertain whether or not to permit the intrusion into the body by way of surgery.

Where I part company with the district court as well as in the analysis of the same subject matter by the panel is that neither opinion analyzes the risk to the patient as I will develop below.

### III

At the rehearing in the state circuit court, the hearing with which we are principally concerned, Dr. Mendez-Picon, who up to that time had been Lee's attending physician, testified that his earlier palpation had not revealed correctly the precise location of the bullet. In preparation for the surgery at MCV, the hospital had been able to localize the bullet by taking X-ray photographs of Lee's shoulder, with a lead marker placed on his skin. The bullet had been localized 2.5–3.0cm. into the deltoid muscle. The bullet lay deeper but higher than he had previously thought. As a result of the localization, Dr. Mendez-Picon could state that he knew the bullet was 5.0–6.0cm. away from the pleural cavity, farther away from that cavity than it was thought to be on the basis of the clinical examination.

Dr. Mendez-Picon testified that under the new facts the proposed surgery would be a simple, minor procedure, which would take less than one-half hour. There were no foreseeable complications, and any bleeding would be minimal. Dr. Mendez-Picon stated that surgical removal of the bullet would not result in any permanent impairment to Lee's arm or shoulder.

Dr. Mendez-Picon explained that the decision to use local or general anesthesia is solely within the province of the surgeon. Dr. Whitley, the surgeon who had replaced Dr. Mendez-Picon, decided, as a result of the depth of the bullet, to remove the bullet under a general anesthesia because the surgery would be safer under general than under local. Dr. Mendez-Picon concurred in Dr. Whitley's decision; the proposed surgery would be less risky and involve fewer complications under general anesthesia because it would proceed more smoothly. Dr. Mendez-Picon explained that under general anesthesia the patient's muscles are more relaxed and the patient experiences less pain. Under local anesthesia the muscles would contract when the patient felt pain, making extraction of the bullet and any fragments more difficult. The relaxed state of the patient's muscles under general anesthesia allows retraction of muscle tissue and exposure of the bullet to be accomplished more easily: "... anything that does not have to be cut is not cut."

In trying to estimate the risks involved in the proposed surgery, Dr. Mendez-Picon stated that the lack of similar cases prevented him from giving a certain figure on the chances of injury or complications. Without giving an exact figure, he said that the chances of injury, permanent or temporary, from removing the bullet surgically are very small.

The risks of anesthesia aside, the risk from the surgery was a little bit greater than before because the bullet was deeper than he had first supposed and the chances

of infection and nerve damage are a little bit greater. Dr. Mendez-Picon estimated that the chance of injury from surgery was double that of before. Whereas before the risk was 1/100,000, now the risk might be 1/50,000. Elsewhere in his testimony, Dr. Mendez-Picon characterized the risk of dying from the surgery itself as being very small, in the order of one chance in 100,000.

Because the proposed surgery now would cut more deeply, it carried a greater possibility of nerve damage. Nerve damage would result in temporary tingling or numbness in Lee's arm. If a nerve were cut, it would, however, regenerate. Dr. Mendez-Picon testified that the chances of the nerve being cut were very small, and, as mentioned, even smaller with general anesthesia because the relaxed state of the muscle tissue allows the surgeon to see the nerves more clearly. Dr. Mendez-Picon testified that a one percent risk of harm in medicine is considered substantial; a risk less than one percent would thus be insubstantial. Therefore, the only evidence in the record on which the district court relied admits of only one conclusion, namely, that the risk of the surgery is clearly insubstantial.

While admitting that his expertise lay outside the field of anesthesiology, Dr. Mendez-Picon opined that the risk of general anesthesia carries a higher risk than that of local anesthesia. Nevertheless, he would usually recommend general unless the patient faces a particular risk due to previous conditions, such as cardiac or pulmonary problems or old age. Surgery under general anesthesia is more comfortable for the patient, and most surgery is done under general anesthesia in spite of a slightly higher risk from the anesthetic even if the patient is older, because the general anesthesia reduces the stress and pain involved. Dr. Mendez-Picon's testimony thus establishes that although in the abstract general anesthesia may involve slightly greater risks than local, those risks may be offset by the decrease in risk where, as here, the general anesthesia makes the surgery itself proceed more smoothly and safely. Dr. Mendez-Picon testified that the use of general anesthesia in minor surgery is commonplace. The outpatient department of MCV routinely uses general anesthesia; the patient receives the general anesthesia at 10 a.m., and he is ready to go home at 3 p.m.

Lee also called as his witness, Dr. C. Paul Boyan, the physician previously mentioned, Professor Emeritus in the Department of Anesthesiology at MCV. At the request of the Department of Surgery, Dr. Boyan performed an examination of Lee to determine the risks to Lee of using anesthesia. Dr. Boyan read Lee's charts and talked with, and examined, Lee. He found that Lee was in good health, had had two previous anesthetics, and was a good risk for general anesthesia. Dr. Boyan, whose service as a surgeon during World War II often required him to remove bullets, testified that removing a bullet from a wound such as Lee's was routine and unproblematic. Although Dr. Boyan had not looked at the X-rays of Lee's shoulder, he had palpated the bullet and estimated that it was no more than a few centimeters under the skin. His palpation had thus meant to him that the bullet was where the X-rays ascertained it to be. On the basis of his examination, Dr. Boyan concluded that the bullet could be surgically removed under either local or general anesthesia.

Dr. Boyan's testimony explicitly addressed the principal concern of the rehearing: what were the new risks injected into the case by the proposal to proceed with the surgery under general anesthesia. Dr. Boyan stated that local anesthesia is usually safer because its use is associated with small, minor procedures, such as the surgery under consideration here, which are over in less than thirty or forty minutes. Dr. Boyan described the findings of a study, conducted at MCV, based on 150,000 patients who have received anesthesia at MCV over the course of 13 years. Taking all forms of anesthesia together, the study showed that the chance of death from anesthesia at MCV is one in 12,000. If children under 12 years are excluded, the chance is one in 14,500. These figures include all patients, 75 percent of whom are in high

risk groups. Dr. Boyan explained that patients are classified in four groups according to risk, and that Lee was in the lowest risk group, group one. Looking at only the good-risk group patients, in groups one and two, the MCV study found that the chance of dying from anesthesia is one in 50,000. Lee's risk would thus be less than one in 50,000. Dr. Boyan quite aptly described this risk as "far fetched." The MCV study, the results of which could not be extrapolated to other hospitals, found that the chances for all groups dying from anesthesia at MCV were roughly equal to the chances of being murdered in the United States within a year or dying in a car accident within 158 days.

Dr. Boyan stated that the MCV study did not, nor could he, statistically quantify the risks of local versus general anesthesia because comparisons had to be made for one type of surgery and one type of patient. Unlike statistical studies on cars, for example, which are supposed to be built to a single set of specifications, all patients are different, he explained. But for a given type of patient and surgery, assuming the involvement of a competent anesthesiologist, the risk of injury, whether temporary or permanent, or of death is the same for local and general anesthesia.

Lee had also called as a witness Dr. Whitley who was scheduled to perform the surgery. Because Lee primarily wanted Dr. Whitley to testify to his desire to perform the surgery under general anesthesia, to which Dr. Mendez-Picon had already testified, and the state circuit court accepted as stipulated, counsel for Lee decided to proceed without Dr. Whitley. Counsel stated that his main concern was with the evidence from the anesthesiologist, not from the surgeon, and that his only complaint about Dr. Boyan's testimony was its failure to quantify statistics. Counsel suggested that if he had had more time he could have found an expert who would have been able to give specific statistical risks of harm to Lee. Of course, such evidence was never forthcoming in later federal court hearing when Lee had all the time he wanted to prepare. No anesthesiologist at all testified at that hearing.

The upshot of all of the testimony relied upon by the district court was that the removal of the bullet would be perfectly routine in every way. When questioned about the adverse effects of Xylocaine, for example, a local anesthetic, Dr. Boyan testified that there was no more risk connected with the injection of that drug into the body than the introduction of any other drug into the body, and he gave as an example Tylenol. I suggest the detailed description of a routine administration of a general anesthetic relied upon in considerable part by the panel for its decision is calculated almost wholly to emphasize the rude insult to the body and to the dignity of the person rather than the risk to the patient. And the same may be said of the district court's less detailed description of the same thing. The same remarks apply to the detailed description of removal of the bullet which only describes a routine surgical procedure.

Thus, I think that unless we are going to establish a rule that the removal of bullets from the person more than skin-deep may not be accomplished under general anesthetic, the risk to the patient is the principal factor which must be considered. Because the only testimony in the record is that if a patient is uncooperative, then a general anesthetic, rather than a local, should be used, this rule places the determination of whether or not the bullet will be removed entirely in the hands of the prisoner. Therefore, I would not adopt such a per se rule as is bound to be the result of this decision by the majority. Although such a rule is not mentioned in the majority opinion, that result is almost bound to happen, for, artful as the language used may be, the description of the bullet removal is nothing more than that of a routine minor surgical procedure under general anesthetic.

It is true that the sensibilities are shocked by an involuntary intrusion into the human body, but it is just as true that they are similarly shocked when a man in an attempted robbery shoots his intended victim

and then is able to withhold evidence of the crime at virtually no risk to himself. Had the assailant only been masked he would certainly go free under the majority opinion. Unless the rule of decision is going to necessarily include how much risk to the patient, and the cases[2] indicate that such should be a principal consideration, decisions in such cases as the one before us will come to be unprincipled holdings. Any surgical procedure is shocking to some, few are shocking to others. The intrusion into the human body at hand shocks the writer, yet I cannot escape the conviction that under *Schmerber* an analysis of the amount of risk to the patient is necessary in each case.

I submit the majority, as did the district court, has substituted an analysis of the rude insult to the body and to the dignity of the person, for risk to the patient. I do not believe these cases should be decided on that ground because there is no sufficient stated principle to guide the decisions of the courts. If we are going to have a rule that no bullet may be routinely removed under general anesthesia which is nine-tenths of an inch below the skin, it is better to say so than to recount in detail a routine minor operation and assign as reasons for our decision the known consequences. Any

penetration of the skin, of course, involves risk; the question must be how much.

The evidence in this record shows that no analysis has been made of risk to the patient by either the district court or by the panel majority, and while I think there is little or no risk, I believe that matter is more properly entrusted to the district court for initial decision. I further believe that, while the fact that the contemplated operation was minor surgery is not dispositive of the case, that factor must be considered in arriving at any decision. Also to be considered is the state proceeding at hand and whether that procedure was fair. I cannot agree that the routine removal under general anesthetic of a bullet imbedded in a muscle nine-tenths of an inch beneath the skin, with virtually no risk to the patient, is per se in violation of the Fourth Amendment. Yet that is the very narrowest holding that the opinion of the majority will permit.

I believe that the statements in *United States v. Crowder,* 543 F.2d 312 (D.C.Cir. 1976), *cert. den.* 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977), supporting the opinion of that court of appeals are well considered. They are: was there any other way to obtain the evidence;[3] whether the

---

**2.** For completeness, I find the following published cases have considered the removal of a bullet from the human body, not that there may not be others:

*United States v. Crowder,* 543 F.2d 312 (D.C. Cir.1976) (en banc), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977); *South Carolina v. Allen,* 277 S.C. 595, 291 S.E.2d 459 (1982); *Doe v. Florida,* 409 So.2d 25 (Fla.App. 1982); *Hughes v. United States,* 429 A.2d 1339 (D.C.App.1981); *Missouri v. Richards,* 585 S.W.2d 505 (Mo.App.1979); *Georgia v. Haynie,* 240 Ga. 866, 242 S.E.2d 713 (1978); *Missouri v. Overstreet,* 551 S.W.2d 621 (Mo.1977) (en banc); *Bowden v. Arkansas,* 256 Ark. 820, 510 S.W.2d 879 (1974); *New York v. Smith,* 80 Misc.2d 210, 362 N.Y.S.2d 909 (1974); *Allison v. Georgia,* 129 Ga.App. 364, 199 S.E.2d 587 (1973), *cert. denied,* 414 U.S. 1145, 94 S.Ct. 899, 39 L.Ed.2d 101 (1974); *Adams v. Indiana,* 260 Ind. 663, 299 N.E.2d 834 (1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1452, 39 L.Ed.2d 494 (1974); *Creamer v. Georgia,* 229 Ga. 511, 192 S.E.2d 350 (1972), *cert. dismissed,* 410 U.S. 975, 93 S.Ct. 1454, 35 L.Ed.2d 709 (1973).

**3.** The majority opinion takes the position that a solid lead bullet already lodged in a human body for nine months may not now be probative as to caliber or land and groove marks because of the deterioration of the lead during the delay. (At p. 901 n. 15). I think this fact finding is without support in the record or in medical learning. A forensic sciences expert testified that a lead bullet may decompose over time, but carefully avoided specifying the duration that would be necessary. Dr. Mendez-Picon testified that the X-rays show an intact bullet that had retained its cylindrical shape and had a slightly bent nose.

The medical literature reveals that decomposition of a lead foreign body would lead to symptoms of plumbism or lead poisoning. Cagin, M.D., Diloy-Puray, M.D., & Westerman, M.D., *Bullets, Lead Poisoning & Thyrotoxicosis,* 89 Annals Internal Med. 509 (1978). The deterioration of a lead bullet is a rare phenomenon presumably because the human body readily encapsulates the bullet with dense avascular fibrous tissue. Switz, M.D., Elmorshidy, M.D. & Deyerle, M.D., *Bullets, Joints, and Lead Intoxication,* 136 Arch. Internal Med. 939 (1976).

operation was major or minor, the precautions taken, the possible complications and risk; and the extent of adversary hearings prior to conducting the surgery. *Crowder* at 316.

I would thus vacate the judgment of the district court and remand the case to it for reconsideration under the principles I have set forth just above, taking care that an analysis of risk to the patient must be more than the self-evident proposition that it does exist.

Dr. Switz has written that the symptoms of lead intoxication following decomposition is controlled by the solubility of lead in the body. *Id.* at 940. Blood serum is a relatively poor solvent, and would in any event have little contact with a bullet encapsulated in avascular tissue. *Id.* at 941. In Dr. Switz's case study, the first in the English literature, symptoms of lead poisoning appeared only 40 years after a bullet was lodged in the ankle region, where the site of the bullet was aggravated by a later injury and thus exposed to increased blood flow and apparently to synovial fluid, which is more corrosive of lead than is blood serum. *Id.* at 939, 941. The recommendation of Dr. Switz

that most bullets need not be removed, obviously because they do not deteriorate, is consistent with the recommendation made here that the bullet in question need not be removed for the sake of Lee's health. But, the fact the bullet in question will not significantly deteriorate is an uncontradicted proclamation of its probative value.

The matter of the deterioration of the bullet, I think, should be the subject of further evidence on remand if the prisoner desires it. Otherwise, I think the record will support only the conclusion that there has been and will be no significant deterioration during the pendency of the litigation.